2011 UT App 168

**STATE of Utah, Plaintiff and Appellee,**

v.

**Ryan David BURKE, Defendant and Appellant.**

**No. 20080941–CA.**

Court of Appeals of Utah.

May 26, 2011.

---

Joseph Jardine, Salt Lake City, for Appellant.

Mark L. Shurtleff and Jeanne B. Inouye, Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and ROTH.

## OPINION

ROTH, Judge:

¶ 1 Defendant Ryan David Burke appeals his convictions for aggravated sexual abuse of a child, *see* Utah Code Ann. § 76–5–404.1 (2008), dealing in material harmful to a minor, *see id.* § 76–10–1206 (Supp. 2007), and forcible sexual abuse, *see id.* § 76–5–404 (Supp. 2010), alleging that numerous errors occurred at trial. We affirm.

## BACKGROUND [1]

¶ 2 On Saturday, September 15, 2007, Burke attended a ten-year high school re-

---

1. "In reviewing the jury verdict, we view the facts and all reasonable inferences drawn there-

union with his former classmate (Father). Although Burke and Father had not been as close over the past few years, they had been friends since middle school and throughout high school and made arrangements to attend the reunion together. The reunion was being held at Snowbird Ski Resort, and Burke was to meet Father at his home in Salt Lake City then ride to the reunion with him. Father's wife (Mother) was out of town that evening, so Father arranged for their four-year-old daughter (Child) to be cared for by her grandfather until Father returned home from the reunion later that night.

¶ 3 Originally, Father had volunteered to be the designated driver for the evening. But at the reunion he decided to drink, so Father and Burke agreed that they would spend the night at Snowbird rather than drive back down the canyon. Father made arrangements for both of them to stay with some other friends who had rented rooms at the reunion site. Father also called his twenty-year-old sister (Aunt), who frequently tended Child, and arranged for her to go to his house and watch Child overnight. At around 11:00 p.m., Child's grandfather dropped Child off at Father's home, and Aunt put Child to bed then went to the master bedroom to do homework.

¶ 4 Sometime after midnight, Burke decided that he did not want to stay at the reunion site and caught a ride back to Father's house with another former classmate (Boyfriend) and the classmate's girlfriend (Girlfriend). During the half-hour car ride down the canyon, Girlfriend rode in the front passenger seat while Burke rode in the back seat. Earlier that evening, Burke had asked Girlfriend for her phone number and she had refused, telling Burke that she and Boyfriend were dating. But during the ride down the canyon, Burke persisted in stroking and "caressing [her] arm" as Girlfriend rested it on the center console of the car. Girlfriend would move her arm in an attempt to stop the touching, but whenever she rested it on the console again, Burke would resume the caressing. Girlfriend described the touching as "uncomfortable" and "inappropriate" because she was sitting right next to Boyfriend. But

not wanting to make the situation more awkward, Girlfriend did not tell Boyfriend about the touching and did not verbally tell Burke to stop.

¶ 5 Boyfriend dropped Burke off at Father's house where he had left his car and where Aunt was now tending Child. Rather than driving home, however, Burke entered Father's home, startling Aunt. Burke was "obviously angry" and "upset" with Father because Father had remained at the reunion site. Burke complained to Aunt that if Father had not changed his plans, he "could have been at home in bed with his girlfriend." Nevertheless, Burke told Aunt that Father had given him permission to stay the night because he had been drinking and could not drive himself home. In fact, Father had not given Burke permission to stay at his house, but when Aunt attempted to confirm this with Father, he did not answer his phone. Aunt then called Mother, who said that "[she] guess[ed]" it would be okay if he stayed, although she was uncomfortable with the situation. Aunt told Burke that he could sleep on a couch downstairs in the basement.

¶ 6 Aunt returned to her homework in the master bedroom, but Burke repeatedly interrupted her studies. About fifteen minutes after he arrived, Burke told Aunt that he was hungry and asked her to come into the kitchen and help him make something to eat. Aunt assisted Burke in the kitchen for about ten or fifteen minutes while Burke heated up some soup and continued to complain about Father's decision to stay at the reunion. Aunt then left Burke in the kitchen and returned to her homework. After another fifteen minutes, Burke again interrupted Aunt, telling her that "he couldn't figure out how to work the TV and needed help." Aunt helped Burke with the television, which was located in the basement where Burke would be sleeping. She then handed him the remote control and began to go back upstairs. Burke, however, stopped her as she was leaving and asked, "[Y]ou're just going to leave me down here by myself? That's kind of lame." Aunt replied that she "still ha[d] a

from in the light most favorable to the verdict."

lot of homework to do, but [she'd] stay for a minute."

¶ 7 Burke lay lengthwise across the couch while Aunt sat on the couch, near his feet. Burke continued to complain about Father's decision to stay at the reunion and how he "could be home sleeping with his girlfriend." As the two talked, the conversation turned to their families: Aunt mentioned that her parents were going through a divorce, and Burke discussed a similar situation with his parents. Aunt was not upset by the discussion, but Burke sat up and began rubbing her back in an ostensibly consoling manner, saying, " 'Oh it's okay. Don't worry about [it].' " Burke had been rubbing her back for about "five seconds, maybe" when—out of nowhere—"[h]e ... put [both his hands] up [her] shirt ... and groped [her]," touching both of her bare breasts and her nipples.[2] Aunt had not been flirting with Burke and had not given him any indication of romantic interest. Rather, Aunt considered her brother's friends to be "like [her] big brothers"— including Burke, whom she had known since she was a little girl. She was "shocked" by Burke's actions and thought that "it was weird that one of [her] brother's friends would touch [her] like that." Aunt immediately pulled Burke's hands out from under her shirt and demanded, "What are you doing?" But Burke laid down on the couch then pulled Aunt "on top of him and started trying to kiss [her]" while saying, " 'Come on, let's make out.' " Aunt, "shocked" and "disgusted" by Burke's actions, pulled away and fled upstairs. Burke called after her, " 'Fine[.] I don't want you here anyways[.] [J]ust leave.' " Aunt shut herself and Child in the upstairs master bedroom. Aunt then sent a series of text messages to Mother, telling her what had happened.

¶ 8 Burke stayed in the house throughout the night. On Sunday, September 16, he ordered four Pay–Per–View and On–Demand pornographic movies from Father and Mother's cable service at 1:30 a.m., 3:00 a.m., 3:30 a.m., and 8:20 a.m. And between the hours of 2:40 a.m. and 3:20 a.m., Burke accessed several pornographic websites on Mother's computer.[3]

¶ 9 Sometime during the morning hours of Sunday, September 16, Child woke up, went downstairs, and walked in on Burke as he was watching what she described as "a grownup movie." The "grownup movie" portrayed acts of oral sex that Child described as "a boy kissing a girl's butt, and a girl ... [s]ucking a boy's penis."[4] Burke was apparently masturbating to the pornographic movie and told Child that he had an "owie" on his penis. He then held Child's hand "very tightly" and made her touch his penis while the "grownup movie" was still playing.

¶ 10 When Aunt awoke that morning, she realized that Child was no longer in the bedroom. Aunt began searching for Child and, as she called out Child's name, Burke came up the stairs with Child on his shoulders. Aunt took Child away from Burke and told him to get out. Burke did not look at Aunt, kept his head down, and said nothing. He then left the house.

¶ 11 Later that day, while at a friend's house with Father and Child, Aunt recounted the events of the previous night. The friend's wife asked if they had questioned Child about whether Burke had done anything to her, given what he had done to Aunt. That possibility had not occurred to Aunt, so she asked Child if Burke had touched her anywhere. Child responded that Burke had "touched [her] hands."[5]

---

**2.** When Burke arrived at the house, Aunt had already gotten ready for bed and was wearing an oversized nightshirt and no bra.

**3.** Aunt testified that she had not ordered any pornographic movies or viewed any pornography that night. Father and Mother testified that they did not authorize Burke to order pornographic movies from their cable service, nor did they order any of the pornography themselves.

**4.** Mother testified that, to her knowledge, Child had never before viewed pornography.

**5.** Father recalled that the questions asked of Child were not whether Burke had touched her but whether Burke had "hurt [her] in any way," and he did not recall her specific answers. Although he was present during this brief questioning, he did not question Child himself and recalled that, based on Child's responses, he perceived that nothing was wrong.

¶ 12 Mother returned home later that same day. On the following Wednesday morning—three days later—Child got into bed with Mother, crawled under the covers, and started kissing Mother in her pubic region, as if simulating oral sex. Mother pulled Child up from under the covers and asked her what she was doing; Child had never before exhibited such behavior. Child then told Mother that Burke had told her that he had an "ouch" on his penis and that he had grabbed her arm and made her touch his penis. Mother told Father about her conversation with Child. Father also questioned Child, who told him that Burke had made her touch his penis. Mother immediately reported the incident to the police. On September 26, Child was interviewed at the Children's Justice Center (CJC), where her interview was videotaped. Child told the interviewer that Burke had been "watching a grown up movie with [her]" downstairs "in [her] house," and that in the movie a "girl [was] sucking the boy's penis and . . . a boy [was] kissing the girl's coco"—a word Child customarily uses for "vagina." [6] Child also said repeatedly that Burke had made her touch his penis, specifically saying that "[h]e touched me on his penis."

¶ 13 When questioned by police about what had occurred in Father's house that night, Burke admitted to ordering pornography through Father and Mother's cable service. When asked about Child also having viewed that pornography, Burke suggested that Child may have come downstairs and seen him watching pornography, although he was unaware of her presence. Burke also maintained, however, that he had not even been aware that Child was in the house that night until he talked to Father several days later. In addition, Burke initially stated that he had not touched Aunt at all, but then clarified that "maybe he did touch her, but it was tickling on her sides." [7] According to Burke, he never touched Aunt's breasts.

¶ 14 Burke was tried by jury. For his conduct involving Child, Burke was convicted of aggravated sexual abuse of a child, *see* Utah Code Ann. § 76-5-404.1 (2008), and dealing in material harmful to a minor, *see id.* § 76-10-1206 (Supp. 2007). Burke was further convicted of forcible sexual abuse, *see id.* § 76-5-404 (Supp. 2010), for his conduct against Aunt. Burke appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 15 Burke first challenges the trial court's denial of his motion to sever for trial the offenses against Child from the offense against Aunt. "[T]he grant or denial of severance is a matter within the discretion of the trial judge, so we reverse [a denial] only if the trial judge's refusal to sever charges is a clear abuse of discretion in that it sacrifices the defendant's right to a fundamentally fair trial." *State v. Balfour,* 2008 UT App 410, ¶ 10, 198 P.3d 471 (alterations in original) (internal quotation marks omitted).

¶ 16 Burke next raises two evidentiary issues regarding Child's testimony: he argues that Child's trial testimony was more prejudicial than probative and, thus, inadmissible under rule 403 of the Utah Rules of Evidence; and he further argues that Child's out-of-court prior consistent statements were inadmissible hearsay under rule 801(d)(1)(B) of the Utah Rules of Evidence. A "trial court's decision to admit or exclude evidence under [r]ule 403 . . . [is reviewed for] an abuse of discretion" and will be overturned only if the trial court's "determination . . . is beyond the limits of reasonability." *State v. Downs,* 2008 UT App 247, ¶ 6, 190 P.3d 17 (first alteration and first omission in original) (internal quotation marks omitted). In reviewing the admissibility of hearsay, legal questions are reviewed for correctness while the ultimate ruling on admissibility is reviewed for an abuse of discretion. *See State v. Workman,* 2005 UT 66, ¶ 10, 122 P.3d 639.

---

6. During the CJC interview, when asked about the "grown up movies," Child repeatedly talked about an object being dropped on a man's head or a man getting hit on the head and a man having something on his head. In the pornographic film that Burke ordered from Father and Mother's cable service at 8:20 a.m. on Sunday, September 16, a man is hit on the head with a cane and throughout the rest of the movie wears a gauze bandage on his head.

7. Aunt testified that Burke never tickled her.

¶ 17 Burke also raises several other evidentiary issues, arguing that the trial court improperly limited his expert's testimony, that evidence was admitted under rule 404(b) for which the State did not give him the required requested notice, and that evidence was admitted that lacked adequate foundation. "[T]he admissibility of expert testimony . . . [is] reviewed under an abuse of discretion standard" and will stand "unless the decision exceeds the limits of reasonability." *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (internal quotation marks omitted). "[A] trial court's decision to admit evidence under rule 404(b) . . . [is reviewed for] an abuse of discretion. . . ." *State v. Killpack*, 2008 UT 49, ¶ 18, 191 P.3d 17. "A trial court's determination that there was a proper foundation for the admission of evidence . . . [is reviewed for] an abuse of discretion." *State v. Torres*, 2003 UT App 114, ¶ 7, 69 P.3d 314 (internal quotation marks omitted).

¶ 18 Finally, Burke challenges the trial court's refusal to ask specific voir dire questions, as well as the trial court's denial of his request for a voluntary intoxication jury instruction. "The scope and conduct of voir dire examination is within the discretion of the trial judge. . . ." *Taylor v. State*, 2007 UT 12, ¶ 70, 156 P.3d 739 (internal quotation marks omitted). The trial court's refusal to give a jury instruction is a question of law, reviewed for correctness. *See State v. Kruger*, 2000 UT 60, ¶ 11, 6 P.3d 1116.

## ANALYSIS

### I. Severance

¶ 19 Burke argues that the trial court abused its discretion in denying his motion to sever the offenses against Child from the offense against Aunt.[8] *See generally Balfour*, 2008 UT App 410, ¶ 10, 198 P.3d 471 ("[T]he grant or denial of severance is a matter within the discretion of the trial judge, so we reverse [a denial] only if the trial judge's refusal to sever charges is a clear abuse of discretion in that it sacrifices the defendant's right to a fundamentally fair trial." (alterations in original) (internal quotation marks

omitted)). Our analysis of this issue is divided into two parts. We must first determine whether the offenses were properly joined. We must then determine whether the offenses should nonetheless have been severed due to any prejudice that may have resulted by their joinder.

### A. Joinder of Offenses

¶ 20 Joinder of offenses is permitted if certain criteria are met. More specifically,

[t]wo or more felonies . . . may be charged in the same indictment or information if each offense is a separate count and if the offenses charged are:

(a) based on the same conduct or are otherwise connected together in their commission; or

(b) alleged to have been part of a common scheme or plan.

Utah Code Ann. § 77–8a–1(1) (2008). We conclude that the offenses were properly joined because they are "connected together in their commission," *see id.* § 77–8a–1(1)(a).

¶ 21 "[C]harges are connected in their commission when there is a 'direct relationship' between them, often because the conduct resulting in one charge was 'precipitated' by conduct resulting in another charge." *State v. Hildreth*, 2010 UT App 209, ¶ 32, 238 P.3d 444 (citing *State v. Scales*, 946 P.2d 377, 385 (Utah Ct.App.1997)); *see also State v. Smith*, 927 P.2d 649, 653 (Utah Ct.App.1996) ("[W]hen criminal conduct resulting in a second charge is precipitated by a previous charge, the two are sufficiently 'connected together' to allow consolidation for trial." (alteration in original) (internal quotation marks omitted)).

¶ 22 Here, the offenses against Aunt and Child can reasonably be seen as "directly related" to one another. The offenses are closely related in time and place, occurring on the same night, within hours of each other, in the same house, and even in the same room on the same couch. When the offenses here are considered together and in conjunction with the surrounding facts and circumstances of the night, an escalat-

---

8. Burke's motion was more accurately a motion to trifurcate, which the district court granted in part, severing another offense that is not at issue here from the offenses involving Aunt and Child.

ing pattern of behavior becomes apparent, in which Burke exhibited increasingly aggressive and opportunistic transgressions of sexual boundaries. This behavior began relatively innocuously when—even after Girlfriend had declined Burke's advances earlier in the evening—Burke stroked and caressed her arm, despite her repeated attempts to disengage and despite Boyfriend's presence with them in the car.[9] Once at Father's home, Burke expressed anger and frustration with Father's decision to stay at the reunion site, specifically complaining that, but for Father's decision, he "could have been at home in bed with his girlfriend." Burke then made repeated excuses to interact with Aunt, his friend's much younger sister, building up to his aggressive groping of her breasts, without having received any indication that such attentions would be welcome. After Aunt forcefully rejected his advances, Burke helped himself to Pay–Per–View and On–Demand pornographic movies over a period of several hours, charging Father's cable service without his permission. Burke then opportunistically took advantage of Child, who had awakened and wandered down to the basement to find him still watching pornography.

¶ 23 A direct relationship among all of these events is readily discernible: when considered together, the events illustrate a distinct behavioral arc of increasingly aggressive and opportunistic transgressions of sexual boundaries, apparently fueled by mounting frustration over repeatedly thwarted attempts at some level of sexual interaction with females who were physically proximate to him. The behavioral arc played out over a relatively brief period of hours, ranging from the relatively minor caressing of Girlfriend's arm in Boyfriend's presence, to Burke's aggressive groping of Aunt, and culminating in his opportunistic sexual assault of Child as he continued to watch pornography at Father's expense. These events are tied together through Burke's single-minded focus on his own sexual gratification, which is apparent not only from his actions toward each of the females who came within his reach but is also evidenced by the fact that he watched hours of pornography over the course of the night as well as his own disgruntled statements that, but for Father's actions, he could have been at home in bed with his girlfriend. This behavioral arc strongly indicates Burke's purpose or motivation throughout that night to gratify his own sexual desire—a central element of the charges here.

¶ 24 While the offenses against Child and the offense against Aunt are not strictly "precipitated" by one another, the events are so related in time, location, and purpose that they are directly connected in a legally significant way. We therefore conclude that the offenses against Child and the offense against Aunt were properly joined for trial because the offenses are connected together in their commission.

B. Prejudice

¶ 25 Even if offenses are properly joined, severance may nonetheless be required to prevent prejudice to the defendant. Specifically, if "a defendant ... is prejudiced by a joinder of offenses ..., the court shall order an election of separate trials of separate counts." Utah Code Ann. § 77–8a–1(4)(a) (2008).

> [C]are must be taken [in joining offenses for a single trial so that joinder] ... is not misused to deprive a[defendant] of a fair trial upon an offense by joining different offenses so that evidence concerning charges unrelated in time and nature, which would normally not be admissible upon a trial, could be admitted as to the multiple offenses in an effort to stigmatize the defendant and thus make it questionable that the jury would give a fair and dispassionate consideration to the evidence. . . .

*State v. Gotfrey*, 598 P.2d 1325, 1328 (Utah 1979). But "[t]he burden of demonstrating prejudice is a difficult one, and the ruling of

---

**9.** Burke has challenged the admission of Girlfriend's testimony under rule 404(b). *See infra* ¶¶ 63–66. Burke's argument, however, is limited to asserting that he did not receive appropriate notice of Girlfriend's testimony under rule 404(b), and he makes no argument that her testimony would be otherwise inadmissible. We therefore consider Girlfriend's testimony in our analysis.

the trial [court] will rarely be disturbed on review. The defendant must show something more than the fact that a separate trial might offer him a better chance of acquittal." *Smith*, 927 P.2d at 654 (internal quotation marks omitted).

¶ 26 To determine whether a defendant is prejudiced by joinder of offenses, the inquiry is " 'whether evidence of the other crime would have been admissible in a separate trial.' " *State v. Balfour*, 2008 UT App 410, ¶ 21, 198 P.3d 471 (quoting *State v. Lee*, 831 P.2d 114, 118 (Utah Ct.App.1992)). Stated differently, joinder of offenses is prejudicial if evidence of each offense would not have been admissible at separate trials for those offenses under rule 404(b) of the Utah Rules of Evidence. *See id.* Thus, to determine whether the aggravated sexual abuse of a child and dealing in materials harmful to a minor offenses against Child would be admissible at a separate trial for the forcible sexual abuse offense against Aunt—and vice versa—we must analyze the reciprocal admission question under rule 404(b).

¶ 27 "[A] trial court's decision to admit [404(b) ] evidence ... [is reviewed] under an abuse of discretion standard" and "[w]e review the record to determine whether the admission of other bad acts evidence was scrupulously examined by the trial judge in the proper exercise of that discretion." *State v. Nelson–Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120 (footnote omitted) (internal quotation marks omitted).[10] A three-part analysis is applied to determine whether evidence is admissible under rule 404(b). *See id.* ¶¶ 18–20. First, we must determine whether the evidence is admissible for a proper, noncharacter purpose under rule 404(b). *See id.* ¶ 18. Second, we consider whether the evidence is relevant under rules 401 and 402. *See id.* ¶ 19. And finally, we must decide

whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under rule 403. *See id.* ¶ 20.

¶ 28 Because we determine that the offenses here would have been admissible at separate trials under rule 404(b), we conclude that Burke was not prejudiced by joinder of the offenses.

### 1. Proper Noncharacter Purpose, Rule 404(b)

¶ 29 Rule 404(b) of the Utah Rules of Evidence provides,

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith .... [but] may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

Utah R. Evid. 404(b). Thus, under rule 404(b), evidence of a defendant's bad acts is not admissible to prove that a defendant has a propensity for bad behavior and has acted in conformity with his dubious character. *See State v. Hildreth*, 2010 UT App 209, ¶ 39, 238 P.3d 444. Rather, evidence is admissible under rule 404(b) if it is offered for a proper, noncharacter purpose. *See id.*

¶ 30 Evidence is offered for a proper, noncharacter purpose if it is offered to prove intent. *See* Utah R. Evid. 404(b). Here, the offenses against Child and the offense against Aunt could be offered as evidence in separate trials for the proper, noncharacter purpose of proving Burke's intent to arouse or gratify sexual desire—a specific intent that is a material element of both aggravated sexual abuse of a child and forcible sexual abuse. *See* Utah Code Ann. § 76-5-404.1(2) (2008) (stating that aggravated sexual abuse

---

10. We acknowledge that in denying Burke's motion to sever the offenses, the trial court simply ruled from the bench that the offenses would remain joined for trial and did not enter any specific findings or conclusions. However, based on the evidence and argument before the trial court on this issue, it can be inferred that the trial court "scrupulously examined" the relevant evidence. *See State v. Nelson–Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120 ("We *review the record* to determine whether the admission of ...

[404(b) ] evidence was scrupulously examined by the trial judge ...." (emphasis added) (internal quotation marks omitted)); *id.* ¶ 28 n. 8 ("While the trial court did not make a specific finding that the evidence ... was admissible under rule 403, that inference follows from the fact that it ruled the evidence admissible....."). Nonetheless, we strongly encourage trial courts to make findings and conclusions on the record concerning their reasoning for denying a motion to sever and admitting 404(b) evidence.

of a child is done "with the intent to arouse or gratify the sexual desire of any person"); *id.* § 76-5-404(1) (Supp. 2010) (stating that forcible sexual abuse is done "with the intent to arouse or gratify the sexual desire of any person"). We acknowledge that the facts underlying the offenses are distinguishable due to the differences in the ages of the victims—a twenty-year-old woman and a four-year-old child—as well as the differences in the specific conduct against each victim—forcibly groping the breasts of one while forcing the other to touch his penis. And we are particularly aware that a defendant's intent to arouse or gratify sexual desire with a twenty-year-old woman is generally not indicative of that same defendant's intent to arouse or gratify sexual desire with a four-year-old child. However, under the unique circumstances of this case where the offenses are so closely related in time and place, the offenses, though distinguishable in some ways, provide strong proof of Burke's increasingly desperate attempts to arouse or gratify his own sexual desire throughout that night, strengthening the likelihood that his intent was the same at the time each offense was committed. In other words, the offenses, when considered together with the circumstances that connect them, show that Burke possessed that specific sexual intent at the time each offense was committed and demonstrate a pattern of conduct related to and arising from that intent, which continued throughout the time period these offenses were committed.

¶ 31 Further, when interviewed by the police, Burke claimed that any touching of Aunt was merely accidental, inadvertent touching or innocent tickling. In this context, the offenses committed against Child provide significant evidence that Burke was sexually focused and indulged in a continuing pattern of behavior throughout the night with the specific intent to arouse or gratify his sexual desire. The evidence of these offenses therefore also makes it more likely that any earlier touching of Aunt was not simply accidental touching or innocuous tickling. *See* Utah R. Evid. 404(b) (stating that other bad acts may be admissible to prove "absence of mistake or accident"); *see also Hildreth,* 2010 UT App 209, ¶ 41, 238 P.3d 444 (stating that

rule 404(b) testimony is admissible to show that touching was not inadvertent or accidental (citing *State v. Fedorowicz,* 2002 UT 67, ¶ 30, 52 P.3d 1194)).

¶ 32 Moreover, these offenses, when considered together, explain Burke's motive for his conduct over the course of the evening, *see* Utah R. Evid. 404(b) (providing that proof of motive is a proper, noncharacter purpose for the admission of evidence), and put the offenses in context by "shed[ding] light on [Burke's] conduct and the surrounding circumstances" of the crimes in a way that is lost when the offenses are considered separately, *see, e.g., State v. Lopez,* 789 P.2d 39, 43 (Utah Ct.App.1990) (reasoning that murder and child abuse offenses were properly joined because the child abuse victim, who was also a witness to the murder, could provide testimony to "shed light on [the] defendant's conduct and the surrounding circumstances" and "the State had no alternate means of bringing the same evidence before the jury," thus making the evidence "reasonably necessary"). Not only do the facts of both offenses establish that Burke acted with a specific intent to arouse or gratify sexual desire throughout the night and that his actions were not accidental or misperceived, but they also illustrate the motive for Burke's actions. We therefore conclude that the offenses could be offered into evidence at separate trials for a proper, noncharacter purpose under rule 404(b).

### 2. Relevance, Rules 401 and 402

¶ 33 We must next determine whether the evidence is relevant. Only relevant evidence is admissible under rule 402 of the Utah Rules of Evidence. *See* Utah R. Evid. 402. " 'Relevant' evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* R. 401. Thus, "[e]vidence is relevant if it tends to prove some fact that is material to the crime charged[,] other than the defendant's propensity to commit crime." *State v. Balfour,* 2008 UT App 410, ¶ 24, 198 P.3d 471 (second alteration in original) (internal quotation marks omitted). Because the

evidence here tends to make it more probable that Burke acted with the motive and intent to arouse or gratify his sexual desire and further gives important context to Burke's actions over the course of the night, we conclude that the evidence is relevant.

### 3. Unfair Prejudice, Rule 403

¶ 34 Third, we must determine whether probative value of the evidence is substantially outweighed by the danger of unfair prejudice under rule 403 of the Utah Rules of Evidence. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Utah R. Evid. 403. Under rule 403, the court "indulge[s] a presumption in favor of admissibility." *State v. Dunn,* 850 P.2d 1201, 1222 (Utah 1993). "Rule 403 does not require a trial court to dismiss all prejudicial evidence because ' "[a]ll effective evidence is prejudicial in the sense of being damaging to the party against whom it is offered." ' " *State v. Killpack,* 2008 UT 49, ¶ 53, 191 P.3d 17 (alteration in original) (quoting *Woods v. Zeluff,* 2007 UT App 84, ¶ 7, 158 P.3d 552 (quoting *State v. Maurer,* 770 P.2d 981, 984 (Utah 1989))). "Rather, the rule only requires that the trial court measure the danger the evidence poses of causing *'unfair* prejudice' to a defendant." *Id.* " 'Unfair prejudice' within [the context of rule 403] means an undue tendency to suggest decision on an improper basis...." *Maurer,* 770 P.2d at 984. When balancing the probative value of bad acts evidence against its potential for unfair prejudice, our analysis is guided by several factors originally enumerated in *State v. Shickles,* 760 P.2d 291 (Utah 1988), commonly referred to as the *Shickles* factors:

> [1] the strength of the evidence as to the commission of the other crime, [2] the similarities between the crimes, [3] the interval of time that has elapsed between the crimes, [4] the need for the evidence, [5] the efficacy of the alternative proof, and [6] the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Id.* at 295–96.

¶ 35 First, the strength of the evidence as to the commission of the "other" offenses here is relatively strong. Both Child and Aunt testified in person at trial and were available for cross-examination. *See generally State v. Marchet,* 2009 UT App 262, ¶ 45, 219 P.3d 75, *cert. denied,* 221 P.3d 837 (Utah 2009) (stating that "the strength of the evidence was great" where both witnesses "testified in person at trial and were available for cross-examination"). The offenses were reported shortly after their commission and none are bad acts based on uncharged conduct, conduct that went unreported for a length of time after the offenses were committed, or conduct that was reported under more questionable circumstances. *See State v. Hildreth,* 2010 UT App 209, ¶¶ 53–55, 238 P.3d 444 (McHugh, J., concurring) (recognizing circumstances making some reported crimes of stronger evidentiary value than others). Further, the evidence of each offense relies on the testimony of a single victim, so this is not a situation where an offense with particularly strong evidentiary support could unfairly pull a weaker charge along in its wake. Thus, we conclude that this factor weighs in favor of admission.

¶ 36 Second, there are both similarities and differences between the offense against Aunt and the offenses against Child. All the crimes at issue here are sexual offenses. However, the offenses were committed against two victims of significantly different ages—a four-year-old child and a twenty-year-old woman—and the underlying conduct of each offense is also different—forcing one victim to touch his penis and forcibly groping the breasts of the other. We thus weigh this factor as favoring exclusion of the evidence.

¶ 37 Third, the interval of time between the crimes strongly favors admission. The offenses here were committed on the same night, within hours of each other. Indeed, they were committed in a single house, in the same room, and even on the same couch. This factor, therefore, weighs strongly in favor of admission.

¶ 38 The fourth and fifth factors—the need for the evidence and the efficacy of alternative proof—also weigh in favor of admission. The testimonies of Child and Aunt are corroborated to some extent by other evidence

presented at trial—such as the text messages Aunt sent to Mother after Burke groped her and the fact that one of the pornographic movies ordered from Mother and Father's cable service matches Child's description of the sexual acts she witnessed. However, proof of the charged offenses rests primarily on Aunt's and Child's testimonies. Thus, despite the other evidence, the jury was faced with a he-said/she-said credibility contest between Burke on the one hand and Aunt and Child on the other. *See, e.g., State v. Nelson–Waggoner,* 2000 UT 59, ¶ 30, 6 P.3d 1120; *Hildreth,* 2010 UT App 209, ¶ 45, 238 P.3d 444; *Marchet,* 2009 UT App 262, ¶ 45, 219 P.3d 75; *State v. Balfour,* 2008 UT App 410, ¶ 25, 198 P.3d 471. This credibility contest is especially prevalent in Child's testimony, the admission and reliability of which was highly contested by Burke at trial and is similarly contested on appeal. *See infra* ¶¶ 45–51. And Aunt's testimony is also contested in that Burke alleged during his interview with the police that any touching of Aunt was accidental, inadvertent, or innocent tickling; thus, Child's testimony would be important at a trial for the offense against Aunt to prove that throughout that night Burke acted with a motive and a specific intent to arouse or gratify sexual desire and, therefore, purposefully touched Aunt in a sexual manner. The entire arc of Burke's behavior during the time in question adds significantly to the credibility of the statements of both Aunt and Child.

¶ 39 The sixth and final factor—the degree to which the evidence is likely to rouse the jury to overmastering hostility—is perhaps the pivotal factor in this case. In analyzing whether the offense against Aunt would be admitted at a trial for the offenses against Child, we conclude that the fact that Burke forcibly groped Aunt's breasts would not rouse the jury to overmastering hostility during a trial for aggravated sexual abuse of a child, where Burke is accused of forcing Child to touch his penis while watching a pornographic movie. *Cf. State v. Bisner,* 2001 UT 99, ¶ 59, 37 P.3d 1073 (noting that the admission of another crime that is "minor in relation to the crimes with which [the defendant] was charged" is not prejudicial). This factor—when considering whether the offense against Aunt would be admissible at a trial for the offenses against Child—weighs in favor of admission.

¶ 40 In contrast, when considering the degree to which the offenses against Child would rouse the jury to overmastering hostility at a trial for the offense against Aunt, we reach a different conclusion. When viewing the totality of Burke's actions throughout that night, where he can be perceived as acting toward each female he encountered with a self-absorbed disregard, the offenses against Child are perhaps less shocking than they would be when viewed in isolation. Nonetheless, the potential for unfair prejudice from admission of evidence of the offenses against Child in a trial for the offense against Aunt is apparent: by its nature, the allegation that Burke committed a sexual offense against a four-year-old child may have an emotional impact on a jury that could suggest a decision on an improper basis. *See State v. Maurer,* 770 P.2d 981, 984 (Utah 1989) (stating that unfair prejudice arises from a tendency to reach a decision on an improper basis, commonly an emotional one). Thus, because evidence of the offenses against Child could have "the tendency to suggest a verdict on an improper, emotional basis" if admitted at a trial for the offense against Aunt, this factor weighs against admission. *See generally State v. Hildreth,* 2010 UT App 209, ¶ 44, 238 P.3d 444 (concluding that the "overmastering hostility" factor weighs against admission where "the cumulative prior bad acts evidence may have the tendency to suggest a verdict on an improper, emotional basis").

¶ 41 Ultimately, however, the analysis under rule 403 requires the probative value of the evidence to be balanced against its potential for unfair prejudice, and evidence should be excluded under rule 403 only if the probative value of the evidence "is *substantially outweighed* by the danger of unfair prejudice." *See* Utah R. Evid. 403 (emphasis added). As we have discussed, all the offenses are closely related in time and place and are strongly connected by intent, purpose, and motive. When all the circumstances are considered together, they tell a cohesive story of the events of the night that is not otherwise

discernable when the offenses are separated and considered separately. The offenses thus have reciprocal probative value of considerable weight that would be lost were the offenses against Child and against Aunt were separately tried. The offenses, therefore, are highly probative of one another.

¶ 42 Specifically with regard to the question of whether the evidence of the offense against Aunt would be admissible at a trial of the offenses against Child, our analysis of the *Shickles* factors leads us to conclude that the general presumption in favor of the admissibility of relevant evidence has not been overcome. *See State v. Dunn*, 850 P.2d 1201, 1222 (Utah 1993) (stating that under rule 403, the court "indulg[es] a presumption in favor of admissibility"). And although we acknowledge the potential for unfair prejudice that may be created by having the offenses against Child admitted at a trial for the offense against Aunt, we must recognize that trial courts are allowed "considerable freedom in applying [rule 403] to the facts [of a case], freedom to make decisions which appellate judges might not make themselves ab initio but will not reverse." *State v. Boyd*, 2001 UT 30, ¶ 40, 25 P.3d 985 (first alteration in original) (internal quotation marks omitted). Given the unique facts of this case, we can imagine two equally reasonable trial court judges reaching different conclusions about the admissibility of this evidence under rule 403 in the exercise of their discretion.

¶ 43 We therefore conclude that, on balance, the *Shickles* factors weigh in favor of both the admission of evidence of the offenses against Child in a trial for the offense against Aunt and the admission of the offense against Aunt in a trial for the offenses against Child. Although the potential for unfair prejudice is present if the evidence of the offenses against Child are admitted at a trial for the offense against Aunt, given the juxtaposition of the time and place as well as the continuity and interrelationship of motivation, conduct, and intent of the offenses, the probative value of the evidence is strong enough under the particular and unique circumstances of this case that it is not "substantially outweighed by the danger of unfair prejudice." *See* Utah R. Evid. 403.

¶ 44 In summary, Burke was not prejudiced by joinder of the offenses because the offenses against Child and the offense against Aunt would be admissible at separate trials. And because the offenses are connected in their commission and their joinder was not prejudicial to Burke, the trial court was within its discretion in permitting the offenses against Child and the offense against Aunt to be joined for trial. We further acknowledge that the question of whether these offenses were properly joined is a very close and difficult one. As with many close questions, the trial court is in the best position to make a decision that falls within the scope of his or her discretion, and we do not believe that the trial court's decision in this instance "sacrifice[d] the defendant's right to a fundamentally fair trial," *see State v. Balfour*, 2008 UT App 410, ¶ 10, 198 P.3d 471 (internal quotation marks omitted).[11]

## II. Evidentiary Rulings Relating to Child's Testimony

### A. Admission of Child's Testimony Under Rule 403

¶ 45 Burke argues that the trial court abused its discretion in refusing to exclude Child's testimony under rule 403 of the Utah Rules of Evidence. *See State v. Downs*, 2008 UT App 247, ¶ 6, 190 P.3d 17 (stating that the trial court's decision to admit evidence under rule 403 is reviewed for an abuse of discretion).

¶ 46 A child who is a victim of sexual abuse is presumed competent to testify at trial. *See* Utah Code Ann. § 76–5–410 (2008) ("A child victim of sexual abuse under the age of ten is a competent witness and shall be allowed to testify without prior qualification in any judicial proceeding. The trier of fact shall determine the weight and credibility of the testimony."). The trial court,

---

11. Nevertheless, we emphasize that the risk of unfair prejudice is high when a sexual offense against an adult is joined for trial with a sexual offense against a child. Such joinder should be rare, but we believe that the unique facts of this case place it within that rare category in which the court could exercise its discretion to join the offenses for trial.

however, may exclude the child's testimony if its "'probative value is substantially outweighed by the danger of unfair prejudice'" under rule 403. *State v. Fulton*, 742 P.2d 1208, 1218 (Utah 1987) (quoting Utah R. Evid. 403); *see also id.* ("[C]ompetency requirements [once] served to ensure that the jury would not be exposed to unreliable testimony ... [and r]ule 403 can be employed to serve a very similar function."). "[I]n determining the probative value and possible unfair prejudice of a child's testimony, the trial court may consider the child's ability to function in the courtroom setting, [that is], to understand questions, to communicate those facts to the jury, to distinguish truth from fantasy or falsehood...." *Id.* at 1218 n. 15. "The court may also consider the age of the child at the time the relevant events occurred, the amount of time that has elapsed, and the degree of recollection the child demonstrates." *Id.* Additionally, "the court may take into account the child's susceptibility to suggestion and whether the child has been intentionally prepared or unconsciously influenced by adults in such a way that it is likely the child is only parroting what others have said about the relevant facts." *Id.*

¶ 47 Prior to trial, Burke moved under rule 403 to preclude Child from testifying, arguing that her testimony would be "more prejudicial than probative because [Child] ... is so susceptible to suggestion" and "is not able to communicate with the jury." In so arguing, Burke pointed to Child's testimony at the preliminary hearing where she had been asked by Burke's counsel the color of a piece of paper and of counsel's shoes. Child answered with the correct colors. Counsel then contradicted Child, telling her that the paper or shoes were a different color, and Child changed her answers to conform with counsel's asserted "correct" answers. Child also had problems remembering descriptive words and would respond, "I don't know," or "I don't know the word"—specifically when attempting to describe parts of the anatomy. In arguing his motion to exclude Child's testimony to the trial court, however, Burke conceded that Child was "normal" for her age.

¶ 48 In response to Burke's motion to exclude Child's testimony, the State acknowledged that because of Child's young age, eliciting her testimony was inherently difficult but argued that Burke's objections to Child's testimony went to weight and credibility rather than admissibility. The State further emphasized that Child's testimony was very probative—she was the only witness who could testify to Burke's conduct against her—and despite the problems surrounding her testimony at the preliminary hearing, she had nonetheless been "able to get all the elements of the crime out."

¶ 49 Although recognizing that "there is some concern with ... [C]hild as a witness," the trial court concluded that Child was not "parroting what others have told her in any way" and, despite her occasional unresponsiveness, Child was capable of testifying and communicating with the jury. The trial court further concluded that Burke's objections to Child's testimony were more appropriately directed at challenging the weight and credibility the jury should give to Child's testimony and would therefore be an appropriate subject of cross-examination at trial. *See* Utah Code Ann. § 76–5–410 (stating that the "trier of fact shall determine the weight and credibility of the testimony" of a child sex abuse victim).

¶ 50 At trial, Child was responsive to all the questions asked of her and testified to the necessary elements of the crime. When Burke's counsel again attempted to contradict her answers regarding the color of a piece of paper or his suit, Child maintained her initial correct answers. At one point during her cross-examination, however, Child asserted that defense counsel had been to her house, taken pictures, and played with her dog. It was later clarified that although Burke's counsel had never been to Child's house, the prosecutors and a police officer had been there and had taken pictures and played with her dog—Child had simply confused defense counsel with one of the prosecutors or the police officer.

¶ 51 Although Child's testimony raises the kinds of concerns that are expected in eliciting the testimony of a four- or five-year-old child, we conclude that the trial court was

within its discretion in admitting Child's testimony under rule 403. After reviewing Child's testimony at trial and at the preliminary hearing, it is apparent that Child was able to "understand questions . . . [and to] communicate those facts to the jury," and there is little in the record to establish that Child had been "intentionally prepared or unconsciously influenced by adults in such a way that it is likely . . . [C]hild is only parroting what others have said about the relevant facts." [12] *See State v. Fulton*, 742 P.2d 1208, 1218 n. 15 (Utah 1987). Further, Child's testimony was highly probative because she was the only person who could testify about Burke's conduct against her. The testimony of children of such tender years is necessarily less articulate and focused than that of older children or adults, but the legislature has determined that such children are not, for that reason, deemed incompetent to testify, *see* Utah Code Ann. § 76–5–410 (2008). Rather, their competence is subject to testing, like that of any other witness, and the trial court is tasked with deciding whether the jury should receive that testimony and apply its own common sense and experience to determine its reliability. Ultimately, we conclude that the trial court's determinations that the probative value of Child's testimony substantially outweighed the danger of unfair prejudice and that Burke's objections to Child's testimony went to weight and credibility rather than admissibility were well within the scope of its discretion. *See id.* (stating that the "trier of fact shall determine the weight and credibility of the testimony" of a child victim of sex abuse).

## B. Admission of Child's Prior Consistent Statements Under Rule 801(d)(1)(B)

¶ 52 Burke argues that Child's out-of-court prior consistent statements were improperly admitted under rule 801(d)(1)(B) of the Utah Rules of Evidence. These statements include (1) Child's statements to Mother that Burke told her that he had an "owie" on his penis and then grabbed her hand and forced her to touch his penis, (2) Child's similar statements to Father, and (3) Child's CJC video interview.[13]

¶ 53 Rule 801(d)(1)(B) of the Utah Rules of Evidence provides that "[a] statement is not hearsay if . . . [t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Utah R. Evid. 801(d)(1)(B). This rule, however, only " 'permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive . . . when those statements were made *before* the charged recent fabrication or improper influence or motive.' "

---

**12.** It is notable that when Child's CJC video interview, preliminary hearing testimony, and trial testimony are compared, Child's recollections of the underlying events are largely consistent with one another.

**13.** At trial, both Burke and the State argued the admissibility of Child's statements to Mother and Father under rule 801(d)(1)(B). Burke and the State similarly argued the admissibility of the CJC video interview under rule 801(d)(1)(B) and further disputed whether admission of the video interview had been stipulated. From our review of the record, however, it appears that the trial court actually admitted Child's statements to Mother and Father on the basis that those statements were not hearsay as defined by rule 801(c), *see* Utah R. Evid. 801(c) (defining "hearsay" as an out-of-court "statement . . . offered in evidence to prove the truth of the matter asserted"), and admitted the CJC video interview under rule 15.5 of the Utah Rules of Criminal Procedure, *see* Utah R.Crim. P. 15.5(a) (allowing statements of a child victim of sex abuse to be admissible if certain conditions are met); *see also State v. Hoyt*, 806 P.2d 204, 209 (Utah Ct.App.1991) (stating that rule 15.5 is not the exclusive method through which a child's testimony may be admitted).

For reasons we need not elaborate on, we decline to review the admission of Child's statements on these bases. And because both parties argued the admissibility of Child's prior consistent statements under rule 801(d)(1)(B) at trial and on appeal, we elect to review the admission of this evidence on that basis. *See Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 ("It is well settled that an appellate court may affirm [a trial court's ruling] . . . if it is sustainable on any legal ground . . . apparent on the record, even though such ground . . . differs from that stated by the trial court to be the basis of its ruling." (internal quotation marks omitted)).

*State v. Bujan (Bujan II),* 2008 UT 47, ¶ 8, 190 P.3d 1255 (emphasis added) (quoting *Tome v. United States,* 513 U.S. 150, 167, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995)). Stated differently, "[r]ule 801(d)(1)(B) applies only to premotive, consistent out-of-court statements." *Bujan II,* 2008 UT 47, ¶ 11, 190 P.3d 1255; *see also State v. Bujan (Bujan I),* 2006 UT App 322, ¶¶ 24–29, 142 P.3d 581 (discussing applicability of rule 801(d)(1)(B)), *aff'd,* 2008 UT 47, 190 P.3d 1255. Statements admitted under rule 801(d)(1)(B) are admitted substantively. *See Bujan II,* 2008 UT 47, ¶¶ 11–12, 190 P.3d 1255 (distinguishing substantive admission of prior consistent statements under rule 801(d)(1)(B) from other consistent statements that are admitted only for rehabilitative purposes).

¶ 54 At trial, Burke cross-examined Child about how she had prepared to testify at trial in a way that invited the jury to infer that her testimony had been influenced or prepared by others. She was asked if her "mommy and daddy [had told her] what [she] w[as] supposed to say"; whether "[she] talk[ed] with [Aunt about] ... what [she] w[as] supposed to say"; whether she had "talk[ed] to [her] grandpa about" her testimony; and if "[she] talk[ed] to any police officers about what [she] need[ed] to say." Child answered that she had talked with Mother, Father, and some police officers about what she was "supposed" to say. She further testified that she had practiced her testimony several times so "[she would] say all the right stuff." By cross-examining Child in this way, Burke strongly implied that Child's trial testimony was the result of "recent fabrication or improper influence or motive." *See* Utah R. Evid. 801(d)(1)(B). The State responded by moving to admit Child's prior consistent statements to Mother and Father as well as her CJC video interview, all of which the trial court admitted over Burke's objections.

¶ 55 On appeal, Burke argues that Child's statements were not admissible as prior consistent statements under rule 801(d)(1)(B) because they were postmotive statements, made only after a improper influence or a motive to fabricate had arisen. Specifically, the motive to fabricate or improper influence alleged by Burke on appeal is that Aunt or Mother influenced Child's recollection through their questioning of her shortly after the underlying events occurred. In support of his argument, Burke identifies two incidents in which he alleges that Aunt and Mother influenced Child's recollections: (1) Aunt's questioning of Child the day after the reunion as to whether Burke had touched her, to which Child responded that he had "touched [her] hands," and (2) Mother's questioning of Child several days later,[14] after Child crawled into bed with Mother and attempted to simulate oral sex, apparently imitating the acts she had seen in the pornographic movie.[15] However, Burke's assertion that a motive to fabricate or improper influence existed at that time is, at best, speculative. Indeed, in his appellate brief he merely asserts that "*[i]f* there was a motive to fabricate ... it occurred during or before the time [Child] first implied inappropriate touching when questioned by [Mother]." (Emphasis added.) Burke presents no facts—other than the mere fact that the questioning occurred—to show that Aunt or Mother improperly influenced Child, that the questioning of Child was so suggestive or oppressive that it would influence Child's answers, or that the questioning was so deliberately focused as to give her a motive to fabricate in order to please her questioners or avoid their censure. Rather, Burke rests his speculative assertion that there was improper influence or a motive to fabricate on the "theory ... that [Child i]s very susceptible to suggestion and that adults can easily and unintentionally give nonverbal cues or

---

14. Although Mother was aware of what had happened between Burke and Aunt, nothing in the record indicates that Mother had been told about the conversation Aunt had with Child prior to Mother's questioning of Child.

15. Burke's argument appears to be that Child's statement to Aunt that Burke had touched her hands is the only statement that is not the product of improper influence because that statement was made before all of the subsequent questioning of Child. Therefore, according to Burke, all the subsequent questioning of Child was the "improper influence" that would give Child a motive to fabricate, making all of Child's subsequent statements about Burke's touching inadmissible under rule 801(d)(1)(B).

suggestion to such a young child." By Burke's logic, any statement by a child that has been elicited through questioning would presumptively be the result of improper influence or a motive to fabricate. We are unwilling to interpret simple questioning of a child—especially a mother's questioning of her child in response to such bizarre and out-of-character behavior—as creating a presumption of improper influence or a motive to fabricate. Burke must show something more in terms of improper influence or motive to fabricate than the record here discloses to take that kind of inference beyond mere speculation. *See, e.g., Bujan II,* 2008 UT 47, ¶¶ 2, 8, 190 P.3d 1255 (concluding that the victim's prior consistent statements were postmotive statements where they were made after the motive to fabricate asserted by the defendant concerning a specific "disciplinary incident" as well as the defendant's "plan[ ] to reunite with a former spouse"); *see also Bujan I,* 2006 UT App 322, ¶¶ 8–9, 142 P.3d 581 (giving further explanation of the specific incidents that demonstrated the victim's motive to fabricate).

¶ 56 Further, Burke's questioning of Child at trial clearly raised the issue of whether Child's trial testimony had been prepared or influenced as the trial date approached. This allegation of improper influence was established when Burke elicited testimony from Child during cross-examination suggesting that Mother, Father, the prosecutors, and some police officers had told her what she was "supposed" to say. In response, the State sought to admit Child's prior statements to Mother and Father, as well as the statements from her CJC video interview. These statements, made soon after the events they described, were consistent with Child's trial testimony and had been made well before Child prepared to testify at trial. These statements were, therefore, particularly relevant because they directly rebutted Burke's allegations that Child's trial testimony had been prepared or influenced. *See*

*generally Tome,* 513 U.S. at 157, 115 S.Ct. 696 (reasoning that prior consistent statements are admitted, not "to counter all forms of impeachment or to bolster the witness," but to directly rebut the asserted motive to fabricate or improper influence).

¶ 57 Accordingly, because Child's prior consistent statements were admitted to directly rebut the improper influence or motive to fabricate Burke asserted on cross-examination and because Burke's other assertions of improper influence and motive to fabricate are, at best, speculative, we conclude that Child's prior consistent statements were properly admitted under rule 801(d)(1)(B).

### III. Trial Court's Evidentiary Rulings

#### A. Limitation of the Expert's Testimony Regarding Evaluation of Child's Testimony

 ¶ 58 Burke argues that the trial court abused its discretion in restricting the scope of his expert's testimony.[16] *See State v. Hollen,* 2002 UT 35, ¶ 66, 44 P.3d 794 ("[T]he admissibility of expert testimony ... [is] reviewed under an abuse of discretion standard" and will stand "unless the decision exceeds the limits of reasonability." (internal quotation marks omitted)). It is important to distinguish that the issue here is not whether Burke's expert testimony was admissible under rule 702 of the Utah Rules of Evidence but whether the trial court was within its discretion in establishing the parameters of his expert's testimony.

¶ 59 During trial, Burke proffered that his expert would testify about "the interviewing techniques ... [used in] the CJC interview, how children interpret nonverbal signals, and some of the particular nonverbal signals that were sent by [the interviewing detective] during the CJC interview and how that could affect [Child]'s memory." Burke also proffered that the expert's testimony would in-

---

16. Burke has presented this argument primarily as a due process issue, alleging that he was prevented "from preparing a complete defense" and his "right to adequate notice was violated." Burke, however, has failed to identify where this due process argument was raised in the trial court, and we can find no place in the record

where such a due process argument was preserved. *See generally Brookside Mobile Home Park, Ltd. v. Peebles,* 2002 UT 48, ¶ 14, 48 P.3d 968 ("[I]n order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue.").

clude information about "the physiological development of a sense of conscience" in children—how "a child learns right from wrong, truth from falsity"—which he asserted was "especially important in this case where [there is] an indication that [Child is] trying to come up with the right answer to please the interviewer." Burke further proffered that the expert's testimony "will focus on memory contamination" and how Child's telling of the events had developed from the "initial disclosure"—when she first told Aunt that Burke had touched her hands—to her testimony at trial.

¶ 60 The trial court responded that it appeared that the expert would be "commenting on the testimony of [Child]." The trial court was "very concerned about anything ... [in the expert's testimony] as it reflects on how the jury should view or interpret [Child]'s testimony," stating that "it's certainly not appropriate to tell the jury what [its] impression should be of [Child]." The trial court, therefore, placed boundaries on the expert's testimony, stating that the expert could "testify about interviewing techniques [or how] ... children develop" but "he could not comment on [Child]'s fidgeting or change of response ... and draw a conclusion from that" because "it seems to imply that the jury should or should not view [her testimony] a certain way." The trial court had "very serious reservations" that the expert would invade the jury's province by somehow instructing the jury on how it should perceive Child's testimony, and the court thus warned Burke to make sure that the expert's testimony was "on firm ground." *See generally State v. Clopten*, 2009 UT 84, ¶ 36, 223 P.3d 1103 (stating that under rule 702 of the Utah Rules of Evidence, which governs the admissibility of expert testimony, " 'an expert ... [may] educate the factfinder about general principles, without attempting to apply these principles to the specific facts of the case,' " thus enabling an expert to give a lecture regarding relevant principles without commenting on witness testimony and thereby "impugn[ing] on the jury's duty as the sole evaluator of the witnesses" (quoting Utah R. Evid 702 advisory comm. note (2007 amend.))).

¶ 61 Despite these constraints, Burke's expert presented testimony at trial that was thorough and comprehensive. The expert had viewed Child's trial testimony and her CJC video interview as well as the preliminary hearing testimony and police reports. When Burke began to elicit testimony regarding specific things Child had said or specific things that had occurred during the CJC interview, the trial court directed that the expert should not comment directly on specific aspects of Child's testimony or her interviews but should instead use hypothetical situations to make his points. From then on, the expert testified using hypotheticals to incorporate various aspects of Child's testimony and further testified about general principles of conscience development, that is, how children develop awareness of the distinction between truth and lying; nonverbal communication; reconstructive memory; memory contamination; reliable and unreliable initial disclosures of sexual abuse; how interviewing techniques can influence children's responses; and children's susceptibility to suggestion.

¶ 62 On appeal, Burke gives no explanation of what else his expert would have testified to but for the trial court's ruling. And based on Burke's proffer of his expert's testimony as well as our review of the expert's testimony, it is unclear what additional information any further testimony would have elicited. Nor is there any indication that the trial court exceeded the limits of reasonability in its concern that, if permitted to testify to the full extent proffered by Burke, the expert would have been commenting on how the jury should perceive Child's testimony, thereby invading the jury's province as the sole evaluator of witnesses. *See generally Clopten*, 2009 UT 84, ¶ 36, 223 P.3d 1103. Further, Burke has presented no argument explaining how the limitation placed on his expert's testimony has harmed him. We therefore decline to find an abuse of the trial court's discretion where there is no showing that the excluded evidence would have had a substantial influence on the outcome. *See id.* ¶ 39 ("We are less likely to find an abuse of discretion where there has been no showing that the excluded evidence would probably have had a substantial influence in bringing

about a different verdict." (internal quotation marks omitted)).

## B. Rule 404(b) Notice

¶ 63 Burke argues that the trial court abused its discretion by admitting evidence under rule 404(b) of the Utah Rules of Evidence because the State failed to give the required notice that it intended to introduce evidence of bad acts. The evidence at issue is (1) Girlfriend's testimony that, during the car ride from the reunion site to Father's house, Burke repeatedly stroked and caressed her arm and (2) Mother's testimony that Burke had accessed pornography on her computer. In response, the State argues—consistent with the trial court's ruling—that this evidence is not 404(b) evidence of "other bad acts" but is evidence of contemporaneous acts that are intrinsic to the crimes charged.[17] On appeal, Burke does not address the basis for the court's ruling regarding the distinction between intrinsic contemporaneous acts and extrinsic prior or subsequent acts but simply asserts that, whether prior, subsequent, or contemporaneous, the evidence at issue was 404(b) evidence and, therefore, notice was required. Further, Burke makes no argument that he was surprised or prejudiced by the State's request at trial to admit this evidence.

¶ 64 Rule 404(b) provides,

Evidence of other crimes, wrongs or acts is not admissible to show action in conformity therewith. It may, however, be admissible for other purposes ... provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the nature of any such evidence it intends to introduce at trial.

Utah R. Evid. 404(b). Utah's rule 404(b) is verbatim to rule 404(b) of the Federal Rules of Evidence, *compare id.* R. 404(b), *with* Fed.R.Evid. 404(b), and the notice provision was adopted in Utah to conform the Utah rule to its federal counterpart, *see* Utah R. Evid. 404 advisory comm. notes. *See also*

*State v. Otterson*, 2010 UT App 388, ¶ 10 n. 5, 246 P.3d 168 ("Utah's rule 404(b) is ... identical to its federal counterpart, though Utah has not included the federal advisory committee commentary in its version of the rule." (citation omitted)). Rule 404(b)'s "notice requirement ... is intended to reduce surprise and promote early resolution on the issue of admissibility." Fed.R.Evid. 404 advisory comm. notes (1991 amend.).

■ ¶ 65 Under the Federal Rules of Evidence, "[r]ule 404(b) does not apply where the challenged evidence is 'inextricably intertwined' with evidence of the crime charged." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir.1995); *see also* Fed. R.Evid. 404 advisory comm. notes; *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir.1993) (" 'Rule 404(b) only applies to evidence of acts extrinsic to the charged crime.' " (quoting *United States v. Pace*, 981 F.2d 1123, 1135 (10th Cir.1992))). Under the federal rule, "[w]hen the other crimes or wrongs occur[ ] at different times and under different circumstances from the offense charged, the deeds are termed 'extrinsic.' " *Barnes*, 49 F.3d at 1149. " 'Intrinsic' acts, on the other hand, are those that are part of a single criminal episode." *Id.; see also Lambert*, 995 F.2d at 1007 (" 'Other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.' " (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir.1990))). "Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity." *Barnes*, 49 F.3d at 1149. Accordingly, federal courts have held that rule 404(b)'s notice requirement "does not extend to evidence of acts which are 'intrinsic' to the charged offense" and applies only to evidence of extrinsic acts. *See* Fed.R.Evid. 404 advisory comm. notes; *see also Barnes*, 49 F.3d at 1149.

---

17. The trial court specifically concluded that these pieces of evidence are "not 404(b) events, but they are contemporaneous events."

¶ 66 On appeal, however, Burke's argument is limited to asserting that, whether prior, subsequent, or contemporaneous acts, notice was required under rule 404(b) yet was not given by the State. He does not address whether the evidence at issue here is intrinsic or extrinsic to the crimes charged, nor does he address the related issue of whether Utah's rule 404(b) should be interpreted the same as the federal rule.[18] In failing to address these issues that are necessary to resolve Burke's arguments on appeal, Burke has not shown that the trial court abused its discretion by admitting this evidence. Further—and most importantly—Burke does not address whether he was unfairly surprised by the lack of notice or whether there would be a reasonable likelihood of a different verdict had this evidence not been admitted. *See generally Otterson,* 2010 UT App 388, ¶ 11, 246 P.3d 168 ("Utah appellate courts have long required a showing of harm to warrant reversal in the face of an erroneous evidentiary ruling."). We accordingly decline to further review this issue on appeal.

C. Authentication

 ¶ 67 Burke asserts that the trial court abused its discretion by admitting a list of internet cookies—a piece of text automatically stored by a web browser that can be used to identify a website that has been accessed on a computer, the website's domain name, and the time and date that website was accessed—arguing that the State had not established an adequate foundation for the list's admission.[19] *See State v. Torres,* 2003 UT App 114, ¶ 7, 69 P.3d 314 ("A trial court's determination that there was a proper foundation for the admission of evidence . . . [is reviewed for] an abuse of discretion." (internal quotation marks omitted)).

¶ 68 When Mother returned home the day after Burke had stayed the night at her house, she noticed that her computer was running very slowly due to numerous internet pop-ups. The computer had not had this problem when she went out of town the day before, so she accessed her computer's internet browsing history, as well as its recorded list of cookies, to try to determine the source of the problem. She discovered that several pornographic websites had been accessed in the early morning hours on the day after the reunion—specifically, on Sunday, September 16 between 2:40 a.m. and 3:20 a.m. The list of cookies included descriptive domain names that suggested pornographic subject matter, and Mother accessed a few of the websites herself to confirm their pornographic content. She then used her computer's cut, copy, and paste functions to copy the list of cookies into a Word document that she later provided to the State. She then cleaned out her computer to prevent further problems with the pop-ups.

¶ 69 At trial, Mother established that Burke would have had access to her computer during the night he was present in her home: her computer had been in her house, it was located in the room adjacent to where Burke stayed that night, and no password was required to simply access the internet. Mother further explained how cookies function by storing a list of "[web]sites that have been visited" through an internet browser, "indicat[ing the] date and time [that] specific [i]nternet sites have been" viewed as well as the domain name of the accessed website. Mother then testified that she personally viewed and prepared the list of cookies and confirmed that the list presented at trial was the same record she had prepared. Burke objected on the basis that inadequate foundation had been laid to admit the list of cookies, specifically requesting more information about the accuracy of the cookies' date and time stamp and whether the date and time stamp could be modified. The trial court overruled the objection.

---

18. Because we need not reach the issue today, we do not decide whether Utah's rule 404(b) operates similarly to the federal rule 404(b) regarding the distinction between extrinsic and intrinsic evidence.

19. Burke also argues that the list of cookies is hearsay. The trial court, however, admitted the list as "illustrative of [Mother's] testimony" in order to refresh her recollection. *See* Utah R. Evid. 612. Burke has, therefore, failed to challenge the basis of the trial court's admission of the list of cookies.

■ ¶ 70 "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Utah R. Evid. 901(a). "Proper authentication does not require conclusive proof but, instead, requires only that the trial court determine that there is 'evidence sufficient to support a finding of the fulfillment of [a] condition' of fact." *State v. C.D.L.*, 2011 UT App 55, ¶ 24, 250 P.3d 69 (alteration in original) (quoting Utah R. Evid. 104(b)); *see also id.* (quoting the advisory committee notes to rule 901 of the Federal Rules of Evidence to explain that "showing authenticity . . . falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in rule 104(b)").

¶ 71 We agree with Burke that Mother could have been questioned about the accuracy of the date and time stamps in order to lay the strongest, most precise foundation possible—especially in light of the fact that it appears from the record that Mother was more than capable of answering such questions. We encourage parties to lay a strong foundation rather than taking the path of least resistance. However, because proper authentication does not require conclusive proof but only requires "evidence sufficient to support a finding of the fulfillment of [a] condition of fact," *see id.* ¶ 24 (alteration in original) (internal quotation marks omitted), we cannot say that the foundation laid here was so insufficient that the trial court's decision constitutes an abuse of its discretion, *see Torres*, 2003 UT App 114, ¶ 7, 69 P.3d 314. Mother's testimony established that she was familiar with the workings of her computer, used it on a regular basis, and had a relatively sophisticated knowledge of the interaction between the computer and the internet. Further, a sufficient foundation was laid through Mother's testimony that the list of cookies was what it purported to be: a list of pornographic websites that had been accessed on Mother's computer sometime between September 15 and 16 while she had been out of town—a time period when Burke had been present in her home and had access to her computer. Under these circumstances, a conclusion that the evidence was what it purported to be was within the trial court's discretion. The issue of what weight the jury ought to give the evidence without more precise information could be addressed through cross-examination and argument. Accordingly, we conclude that the trial court's decision to admit the list of cookies into evidence was within its discretion.

## IV. Voir Dire

¶ 72 Burke argues that the trial court abused its discretion by limiting his requested voir dire questions. *See generally Taylor v. State*, 2007 UT 12, ¶ 70, 156 P.3d 739 ("The scope and conduct of voir dire examination is within the discretion of the trial judge." (internal quotation marks omitted)). Specifically, Burke requested questions regarding (1) whether the potential jurors actively attended religious services and, if so, how often, (2) whether they believed that being charged with a crime is indicative of guilt, (3) whether the potential jurors could set aside the "outrage[ ] and horr[or]" that would naturally be felt in response to a case that involves "sexual acts between an adult and a child" to "examine the evidence . . . and reach a conclusion objectively," and (4) whether during deliberations each potential juror could be respectful of the opinions and conclusions of other jurors without subjecting them to ridicule and could express his or her own opinion even if the other jurors disagreed and subjected him or her to ridicule.

■ ¶ 73 "[V]oir dire examination has as its proper purposes both the detection of actual bias . . . and the collection of data to permit informed exercise of the peremptory challenge." *State v. Piansiaksone*, 954 P.2d 861, 867 (Utah 1998) (alteration and omission in original) (internal quotation marks omitted). "The scope and conduct of voir dire examination is within the discretion of the trial judge." *Taylor*, 2007 UT 12, ¶ 70, 156 P.3d 739 (internal quotation marks omitted). "[T]rial courts should be permissive in allowing voir dire questions and should exercise their discretion in favor of allowing counsel to elicit information from prospective jurors." *Id.* (internal quotation marks omitted). "Nevertheless, trial judges are not compelled

to permit every question that ... might disclose some basis for counsel to favor or disfavor seating of a particular juror." *Id.* (omission in original) (internal quotation marks omitted). "Nor [is a] ... defendant ... entitled to ask questions in a particular manner." *Id.* (internal quotation marks omitted). Rather, when asking voir dire questions targeted at uncovering an area of potential bias, so "long as the relevant subject area of potential bias was covered," the voir dire is not made defective "by the failure to ask questions in a particular manner." *Piansiaksone,* 954 P.2d at 867. And when asking voir dire questions targeted at gathering information to more "intelligently exercise peremptory challenges," the voir dire is not defective so long as, "considering the totality of the questioning, counsel was afforded an adequate opportunity to gain the information necessary to evaluate jurors." *Id.* at 867–68 (internal quotation marks omitted); *see also Taylor,* 2007 UT 12, ¶ 70, 156 P.3d 739 ("[W]hen we review a trial court's voir dire decision[ ] to determine whether the court abused its discretion we ask whether, considering the totality of the questioning, counsel was afforded an adequate opportunity to gain the information necessary to evaluate jurors." (internal quotation marks omitted)). Thus, the trial court's discretion in determining what questions to ask during voir dire "is strictly limited where the questions are directly related to bias and prejudice, but increases as the directness of that relation decreases." *Piansiaksone,* 954 P.2d at 868.

¶ 74 First, the trial court declined to ask Burke's proposed voir dire question concerning religious service attendance, stating that "[r]eligion has no basis in this case whatsoever." Although inquiry into potential jurors' religious affiliation or activities may occasionally be permissible during voir dire where clearly relevant, *see Depew v. Sullivan,* 2003 UT App 152, ¶¶ 19–22, 71 P.3d 601; *Hornsby v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints,* 758 P.2d 929, 933–34 (Utah Ct.App.1988), the question requested here was not phrased in a manner calculated to uncover potential bias pertinent to the facts of this case, *see, e.g., State v. Ball,* 685 P.2d 1055, 1060 (Utah 1984) (concluding that

proposed voir dire question as to whether potential jurors decided not to drink for personal or religious convictions was appropriate to explore potential bias or prejudice in a trial for driving under the influence of alcohol). Burke has presented no argument explaining what information this question would have uncovered, how that information would have allowed him to evaluate the potential jurors in a way relevant to the facts of this case, or how failure to elicit this information was ultimately harmful to him. We can envision a question regarding potential jurors' personal or religious beliefs concerning alcohol or pornography being relevant under the facts of this case. *See, e.g., id.* Such a question, however, is not what Burke requested. And any relationship between the question Burke requested regarding religious services attendance and any information concerning a potential juror's biases and prejudices regarding alcohol or pornography is tenuous at best. Accordingly, the trial court's decision not to ask this proposed voir dire question was within its broad discretion.

¶ 75 The trial court also denied Burke's request for questions regarding the nature of the charges and the presumption of innocence, concluding that the requested questions had "either ... been asked to the [c]ourt's satisfaction or would be ... topics of a jury instruction." The trial court further stated that it had gone "out of its way to discuss burden of proof and presumption of innocence, and those will be covered later in jury instructions." Burke has interpreted the trial court's ruling as relying on jury instructions rather than voir dire to uncover and resolve a potential juror's bias. Such an approach would be in derogation of the historic and legally-sanctioned role of voir dire as the principal tool for discovering potential bias in order to avoid seating a juror whose beliefs or attitudes could result in biased decision-making. Our review of the voir dire proceedings as a whole, however, leads to the conclusion that the trial court decided not to ask the requested questions because it had adequately questioned the potential jurors on those issues—topics that would also be the subject of jury instructions. Thus, the trial court did not relegate the issues to be dealt

with in jury instructions alone but determined that it had already explored these areas of potential bias to its satisfaction and then acknowledged that these areas would also be the subject of jury instructions later in the proceedings.

¶ 76 Indeed, the trial court conducted an extensive voir dire, during the course of which it informed the potential jurors about the presumption of innocence and burden of proof and questioned whether any panel member was unwilling to follow those requirements. The trial court also asked the panel members whether, as prospective jurors, they were willing to follow the instructions on the law that the court would give them during the trial. The trial court further informed the potential jurors that this case involved sexual acts between an adult and a child, asked whether any potential juror knew a victim or person who had been accused of sexual abuse, and inquired whether the potential jurors could nonetheless be fair and impartial and reach a verdict based on the evidence.

■ ¶ 77 Although the trial court did not ask precisely what Burke requested, much of the voir dire was based on issues that were the focus of his proposed questions: whether the potential jurors could be unbiased and impartial in light of the nature of the charges and whether the potential jurors would accord Burke the presumption of innocence and appropriately apply the required burden of proof. *See Taylor v. State,* 2007 UT 12, ¶ 70, 156 P.3d 739 (stating that a defendant is not "entitled to ask questions in a particular manner" (internal quotation marks omitted)). Here, "the relevant subject area of potential bias was covered," *State v. Piansiaksone,* 954

P.2d 861, 867 (Utah 1998), and "considering the totality of the questioning, [Burke] was afforded an adequate opportunity to gain the information necessary to evaluate jurors," *see Taylor,* 2007 UT 12, ¶ 70, 156 P.3d 739 (internal quotation marks omitted). Accordingly, we cannot say that the trial court abused its discretion by limiting these voir dire questions as it did.[20]

■ ¶ 78 Finally, Burke's requested voir dire questions concerning how the potential jury members would conduct themselves during deliberations appear to be more targeted at collecting data to permit him to intelligently exercise his peremptory challenges than at discovering potential bias. *See Piansiaksone,* 954 P.2d at 867–68. Although we cannot see the harm in permitting questions such as these to be asked, we similarly cannot say that the trial court abused its discretion by declining to ask them because, "considering the totality of the questioning, [Burke] was afforded an adequate opportunity to gain the information necessary to evaluate jurors," *see Taylor,* 2007 UT 12, ¶ 70, 156 P.3d 739 (internal quotation marks omitted).[21]

¶ 79 In summary, the trial court did not abuse its discretion by either refusing to ask Burke's requested voir dire questions or asking the substance of those questions in a way that differed from Burke's requests.

## V. Voluntary Intoxication Jury Instruction

■ ¶ 80 Burke argues that the trial court erred in denying his request for a voluntary intoxication jury instruction. *See generally State v. Kruger,* 2000 UT 60, ¶ 11,

---

20. In addition, Burke's requested voir dire question about whether the potential jurors could set aside the "outrage[] and horr[or]" that would naturally be felt in response to a case that involves "sexual acts between an adult and a child" was inappropriately phrased, and the trial court was well within its discretion in rejecting such a question. Although the purpose of the question was apparently to determine whether the potential jurors could be impartial given the nature of the charges at issue here, the way the question was phrased implied that the potential jurors could not and should not be impartial due to the "horr[ific]" nature of the charges. The question, therefore, would likely implant a sug-

gestion of bias and partiality rather than uncover whether that bias or partiality independently existed.

21. It is worth further mention that the members of the jury were specifically instructed on how they should conduct themselves during deliberations, including admonitions to make their ultimate decisions independently while giving due regard to the views of other jurors. It is standard jury instructions like these that the court obviously had in mind when it indicated that subsequent instructions would address some of Burke's concerns.

6 P.3d 1116 ("Whether a trial court committed error in refusing to give a requested jury instruction is a question of law, which we review for correctness.").

¶ 81 Voluntary intoxication is an affirmative defense. *See* Utah Code Ann. §§ 76–2–306, –308 (2008); *State v. Sellers,* 2011 UT App 38, ¶ 17, 248 P.3d 70. "When a criminal defendant requests a jury instruction regarding a particular affirmative defense, the court is obligated to give the instruction if evidence has been presented … that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant." *State v. Low,* 2008 UT 58, ¶ 25, 192 P.3d 867. However, a court need not instruct the jury on the requested affirmative defense where the evidence is "so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether … [the] defendant" acted in accordance with that affirmative defense. *State v. Piansiaksone,* 954 P.2d 861, 872 (Utah 1998) (omission in original) (internal quotation marks omitted).

¶ 82 Voluntary intoxication is only a viable "defense to a criminal charge … [if] such intoxication negates the existence of the mental state which is an element of the offense." Utah Code Ann. § 76–2–306. Further, "voluntary intoxication … is only a defense to specific intent crimes." *Adams v. State,* 2005 UT 62, ¶ 22, 123 P.3d 400. In this case, Burke's intoxication must have been sufficient to have negated the specific intent to arouse or gratify sexual desire. *See* Utah Code Ann. § 76–5–404.1 (stating that aggravated sexual abuse of a child is done "with the intent to arouse or gratify the sexual desire of any person"); *id.* § 76–5–404 (Supp. 2010) (stating that forcible sexual abuse is done "with the intent to arouse or gratify the sexual desire of any person"). Thus, evidence must have been presented that Burke "was so intoxicated at the time of the crime[s] that he was unable to form the specific [sexual] intent necessary" for their commission. *See State v. Wood,* 648 P.2d 71, 90 (Utah 1982); *see also State v. Cummins,* 839 P.2d 848, 857 (Utah Ct.App.1992) (stating that the voluntary intoxication affirmative defense is "statutorily limited to showing that the alcohol deprived [the] defendant of the capacity to form the mental state necessary" for the crime).

¶ 83 Here, several witnesses testified that Burke had been drinking on the night of the reunion and into the early hours of the next morning. Boyfriend testified that, during the car ride from the reunion site to Father's house, Burke's speech was slightly slurred and he was very animated but he was coherent enough to give directions to Father's house. Girlfriend thought that Burke had been drinking at the reunion, though she did not recall whether Burke had glassy eyes, slurred speech, or trouble walking. Aunt testified that Burke wanted to stay the night at Father's house because he had been drinking at the reunion and could not drive home. But according to Aunt, although Burke looked "a little glazed-over," he "was coherent"; she could not smell alcohol on him and stated that if he had been drinking "you couldn't really tell that he was drunk." The morning after the reunion, after Burke had left the house, Aunt and Father discovered that Burke had left a mess in the basement, leaving empty beer cans or bottles around the room. They also discovered a vomit-filled towel, giving them the impression that Burke had thrown up sometime during the night and then tried to clean up after himself.

¶ 84 Although this evidence certainly establishes that Burke had been drinking around the time the charged offenses were committed, the mere fact that he consumed alcohol and was intoxicated to some degree is insufficient to entitle Burke to a voluntary intoxication jury instruction. *See Adams,* 2005 UT 62, ¶ 22, 123 P.3d 400 (stating that mere proof of drinking or being drunk is not enough to mount a voluntary intoxication defense); *Wood,* 648 P.2d at 90 (noting that the defendant must "prove much more than [the fact that] he had been drinking" before committing the offense to be entitled to a voluntary intoxication defense). In particular, this evidence is insufficient to show that Burke lacked the specific intent to arouse or gratify his own sexual desire because the evidence of Burke's continued focus on his own sexual desire and gratification is so pervasive under the facts of this case that there is no reason-

able basis for a voluntary intoxication jury instruction. Accordingly, we conclude that the trial court correctly refused to give a voluntary intoxication jury instruction because the evidence was "incapable of raising a reasonable doubt in the jury's mind," *see Piansiaksone,* 954 P.2d at 872 (internal quotation marks omitted), that Burke "was so intoxicated at the time of the crime[s] that he was unable to form the specific [sexual] intent necessary" for their commission, *see Wood,* 648 P.2d at 90. *See also State v. Gunn,* 102 Utah 422, 132 P.2d 109, 111 (1942) ("[N]o reasonable mind could conclude that . . . [the defendant's] state of intoxication was such as to create a reasonable doubt as to his capacity to entertain the intent to commit the alleged crime.").

### VI. Miscellaneous Issues

¶ 85 Burke has raised other claims on appeal that we will briefly address here.

▬ ¶ 86 First, Burke challenges the trial court's restrictions on certain aspects of his cross-examination under the Confrontation Clause. Although a cross-examiner should be allowed " 'wide latitude in exposing a witness' potential bias, the right of cross-examination is not without limitation.' " *State v. Calliham,* 2002 UT 87, ¶ 31, 57 P.3d 220 (quoting *State v. Hackford,* 737 P.2d 200, 203 (Utah 1987)). " '[T]rial judges retain wide latitude . . . to impose reasonable limits on . . . cross-examination[, for t]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *Id.* (first alteration in original) (emphasis omitted) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Here, the trial court concluded that Burke's proposed cross-examination to elicit testimony about one witness's history as a victim of abuse and another witness's "party" lifestyle was not relevant. *See generally Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431 (stating that cross-examination may be limited to prevent "interrogation that is . . . only marginally relevant"). We agree that, at best, the proposed cross-examination was "only marginally relevant," *see id.,* and further conclude that Burke has failed to show that his proposed cross-examination topics were designed to expose potential bias rather than to harass or humiliate the witnesses, *see Hackford,* 737 P.2d at 203.

▬ ¶ 87 Burke also challenges the trial court's decision not to accept into evidence a police report offered under rule 803(8)(C) of the Utah Rules of Evidence. Without deciding whether this police report was properly excluded, we conclude that any error was harmless because the police officer who prepared the report testified in detail to its contents at trial and the witnesses who provided the report's information to the police officer were cross-examined about its contents. *See generally State v. Hamilton,* 827 P.2d 232, 240 (Utah 1992) ("Harmless errors are errors which, although properly preserved below and presented on appeal, are sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." (internal quotation marks omitted)). We further note that the reliability of the contents of the police report is highly questionable because it is a hearsay-laden description of the events of September 15 and 16 compiled from communications among several witnesses that appears to be, essentially, the end result of a game of "telephone."

### CONCLUSION

¶ 88 For the foregoing reasons, we affirm.

¶ 89 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and CAROLYN B. McHUGH, Associate Presiding Judge.