2018 UT App 192

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOHN E. GALLEGOS,
Appellant.

Opinion
No. 20150688-CA
Filed October 4, 2018

Second District Court, Ogden Department
The Honorable Mark R. DeCaria
No. 111900879

Samuel P. Newton, Attorney for Appellant

Sean D. Reyes and Daniel W. Boyer, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGE GREGORY K. ORME concurred. JUDGE RYAN M. HARRIS
concurred in part and dissented in part, with opinion.

MORTENSEN, Judge:

¶1     A group was busy spray-painting a wall when Victim interrupted their evening activity. Upset by the intrusion, one of the group members stabbed Victim twice in the chest and once in the back, while others threw rocks and beer cans and unleashed two dogs to attack Victim. Police, with the help of Witness, later identified defendant John E. Gallegos as the one who stabbed Victim and arrested him that night. Upon arresting Gallegos, police found blood on Gallegos's shirt, pants, and ear, as well as on a folding knife in his pocket. Victim survived the attack and, after viewing a photo lineup at the hospital, identified Gallegos as the person who stabbed him. While in custody at the police station, Gallegos

kicked and spit at a police officer and also used a chair to smash a hole in a wall.

¶2 For his involvement in the stabbing, Gallegos was convicted of attempted murder, possession of a dangerous weapon by a restricted person, using a dangerous weapon in a fight, graffiti, and consumption of alcohol by a minor (the Stabbing Charges). For his actions at the police station after his arrest, Gallegos was also convicted of assault by a prisoner, propelling a substance or object at a peace officer, and damaging a jail (the Police Station Charges). He appeals, arguing that (1) trial counsel was ineffective for not moving to sever the Stabbing Charges and Police Station Charges and (2) police lacked reasonable suspicion to stop him the night he was arrested. Gallegos also seeks remand pursuant to rule 23B of the Utah Rules of Appellate Procedure. We deny the rule 23B motion and otherwise affirm.

BACKGROUND

¶3 Victim's RV, in which he was staying, had broken down. With the permission of a library security officer, Victim parked the RV at the library lot for the night. Later that evening, Victim heard someone using a spray can outside. Intending to pay the vandals twenty dollars to leave his RV alone, Victim left his RV and approached the bathroom of a nearby park, where he saw someone spray painting the wall.

¶4 As Victim approached, a group of men emerged from behind the bathroom and surrounded him. Gallegos began yelling at Victim and threw what Victim thought were punches at his chest. But when Victim suddenly began struggling to breathe, he realized he had been stabbed.

¶5 The other men joined in the attack, throwing rocks, cans, and other debris. As Victim tried to escape, a large rock hit him on the head. Someone in the group yelled "Attack," and

two dogs lunged at Victim, biting his leg. Victim continued to retreat, dragging along the dog that had clamped down on his leg. Gallegos again stabbed Victim, this time in the back. Just before losing consciousness, Victim crawled to a nearby truck and asked for help.

¶6     Witness, who was one of the truck's occupants, testified that he saw a group of men and dogs chasing Victim. Witness saw Gallegos standing roughly ten feet in front of the group and swinging something at Victim. The rest of the group stood back and threw cans at Victim.[1] Witness exited the truck and confronted Gallegos. Witness further testified that Gallegos approached Witness with something shiny in his hand. Gallegos came within ten feet of Witness and yelled, "You want some too homey? Get the fuck back in the truck." The attackers fled when they realized one of the truck's passengers had called the police. Witness tended to Victim until the police arrived.

¶7     The police first interviewed another witness (Bystander) who had been at the park. Bystander reported seeing several Hispanic men wearing white jerseys with dark numbers run toward a nearby dead-end street, where a Toyota Camry shortly emerged and headed away from the scene. After reporting this information to the police, Bystander saw the Camry return to the same street. Nearby officers were alerted to look for Hispanic men, wearing white jerseys or shirts, in a Camry on a dead-end street. Only later did the police receive a more detailed description from Witness— who had stood ten feet away from and was threatened by Gallegos—that Gallegos was actually wearing dark clothes.

---

1. It is important to note that both Victim and Witness saw that only a single person—Gallegos—was ever close enough to stab Victim.

¶8    An officer arrived at the dead-end street and saw a parked Camry with a man, Gallegos, wearing dark-colored clothes, standing nearby with two women. Without activating the patrol car's overhead lights, the officer parked and got out. The three people near the Camry began walking away and were about to go behind a house. The officer, with his flashlight on, yelled, "Hey, come back and talk to me." The officer testified that he yelled so Gallegos could hear him but did not command Gallegos to comply. Gallegos returned to speak with the officer.

¶9    Not realizing that Gallegos was, in fact, the suspect in the stabbing, the officer asked Gallegos what he was doing in the area. Gallegos responded that he was on his way to a friend's house. The officer noticed tattoos on Gallegos's hands and asked if he was in a gang. Gallegos told the officer that he used to be a member of the South Side Colonia[2] Chiques. When another officer arrived, the first officer ran a warrants check on Gallegos. The warrants check confirmed Gallegos's membership in the South Side Colonia Chiques. The officer asked Gallegos if he was carrying any weapons, and Gallegos answered that he was not. Responding to a request from the officer, Gallegos agreed to be searched. The officer found a five-inch folding knife in Gallegos's back pocket. At the time, the officer did not notice any blood on the knife, which was folded closed. Having determined during their discussion that Gallegos was intoxicated, the

---

2. The briefs and much of the record transcripts and other documents refer to the gang as the South Side "Colonial" Chiques. We believe this is a typographical error. At least one presentence report identifies Gallegos's gang as "La Colonia Chiques Surrenos." Further, "Colonia Chiques" is used in informational materials supplied by the Salt Lake Area Gang Project. *See* Gang Names & Alliances in the Salt Lake Area, http://www.wvc-ut.gov/DocumentCenter/View/6752/Gang-Handouts [https://perma.cc/58DC-MT9A].

officer said, "Being in your state right now, being a gang member, you probably shouldn't be carrying a knife." Gallegos responded, "Well, you can keep it." The officer offered to hold the knife at the police station until Gallegos was sober, whereupon Gallegos could pick it up. Gallegos agreed and left in the direction he had been walking earlier.

¶10   Having concluded his encounter with Gallegos, the officer drove to the park where the stabbing occurred. There, the officer learned from other officers that the attacker was, in fact, a member of the South Side Colonia Chiques gang and wore dark clothing instead of white. Realizing that Gallegos matched the updated description, the officer inspected Gallegos's knife more closely, unfolding it and finding blood on the blade. The officer reported his encounter, and Gallegos was apprehended shortly thereafter.[3]

---

3. The dissenting opinion highlights Witness's identification of Gallegos as problematic evidence, in part because Witness identified Gallegos as the attacker during a police "showup." *Infra* ¶ 62. Witness told the police that he could "[w]ithout a doubt" identify the stabber. Officers drove Witness to the street where Gallegos had been arrested. An officer shined a spotlight on Gallegos, the only suspect present, and Witness indicated that Gallegos was the attacker who confronted him at the park.

We agree with the sentiment expressed by the dissent that this type of identification is problematic. *See State v. Ramirez*, 817 P.2d 774, 784 (Utah 1991) (explaining that the "blatant suggestiveness" of a showup where the defendant identified "was the only person at the showup who was not a police officer," "stood with his hands cuffed," and had "headlights of several police cars . . . trained on him" is "troublesome"). Because we recognize the problems inherent with this type of identification, we are careful not to emphasize this evidence in our determination of the strength of the evidence overall. Our

(continued…)

¶11   Upon arresting Gallegos, the officers found drops of blood by Gallegos's ear and on his hands, along with blood stains on his shirt and pants. He also had blue residue on his hands. Gallegos explained that he had been boxing that day and had also fallen while running away from police earlier that night. While all of the blood samples were not tested, lab results showed that the blood on Gallegos's knife, shirt, pants, and ear matched Victim's DNA.

¶12   While in custody at the police station, Gallegos noticed photographs of fellow gang members on the wall. Gallegos became angry and, while in handcuffs, started to walk away from officers. An officer caught him at the door, and Gallegos kicked the officer in the leg before being subdued. Officers led Gallegos to an interview room where he spit in an officer's face. Alone in the room, Gallegos began yelling and banging on the walls. Officers returned to the room to find chairs overturned and a fresh hole in the wall.

¶13   The next day, officers went to the hospital to interview Victim about the stabbing and to show him a photo lineup. Victim had not taken medication for five hours and confirmed to the officers that he was thinking clearly during the interview. Based on the photo lineup, Victim identified Gallegos as the man who stabbed him.

¶14   The State charged Gallegos for his involvement in the stabbing and for his violent behavior at the police station. The case proceeded to trial, and Gallegos moved to suppress evidence stemming from the encounter Gallegos had with the officer on the dead-end street, arguing that the officer lacked reasonable suspicion to stop Gallegos.

_____

(…continued)
conclusion that the evidence against Gallegos is overwhelming is only minimally buttressed by Witness's identification.

¶15    The trial court ruled that Gallegos's conversation with the officer was a consensual encounter and thus did not require the officer to have reasonable suspicion. In doing so, the court acknowledged that "under certain circumstances an officer yelling at someone to stop . . . immediately conveys a sort of Level 2 . . . scenario," but that an encounter with police is "entirely fact intensive and [yelling] hey come back and talk to me isn't necessarily stop, police." Rather, it "actually invites a voluntar[y] return." The court concluded,

> [W]hen you look at the entire circumstances in addition to [the police officer's statement to Gallegos], that he was talked to, he wasn't placed in custody, there weren't lights going on, there weren't sirens, he didn't have his gun drawn, there weren't other officers around, [and] his ingress and egress wasn't blocked by a show of force . . . this was a consensual encounter . . . even to the point where [Gallegos] allows the officer to search him.

The court further reasoned that it was "consensual to the point where the officer established enough of a rapport with [Gallegos] to say you shouldn't be carrying this knife in your condition and . . . instead of arresting him for possession of a weapon while intoxicated or something like that he gave him the option of just coming down to the police station the next day and picking it up." And the fact that Gallegos told the officer to just keep the knife, in the view of the court, "convey[ed] nothing more than a consensual conversation between the two individuals."

¶16    Prior to trial, Gallegos personally addressed the court regarding issues he was having with his trial counsel and his desire to sever the charges against him. Because all of the charges stemmed from "one joint act," Gallegos's trial counsel believed the charges could not be severed. The trial court agreed to hear Gallegos but explained to him that it "usually will not consider severing charges unless grounds can be stated for

severance." Gallegos explained his frustration with counsel, but his counsel argued that Gallegos wanted the charges severed because there was little evidence on some of the charges, such as his graffiti charge. The court denied the motion to sever and explained, "It may actually even be that prior to submission to the jury, the Court may determine that there [is] a reasonable doubt on the graffiti charge and it may not send that to the jury."

¶17   After the court denied the motion to suppress and the motion to sever, the case went to trial, and Gallegos was convicted on all charges. Gallegos appeals.

ISSUES AND STANDARDS OF REVIEW

¶18   Gallegos raises three issues for our review. First, Gallegos filed a motion for remand under rule 23B of the Utah Rules of Appellate Procedure. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Crespo*, 2017 UT App 219, ¶ 24, 409 P.3d 99 (cleaned up).

¶19   Second, Gallegos contends that his trial counsel was ineffective for failing to move for severance of the Stabbing Charges and the Police Station Charges.[4] "When a claim of

---

4. Gallegos also argues in the alternative that the trial court erred in denying his motion to sever. At trial, Gallegos's argument to the court was that evidence supporting his graffiti conviction was weak compared to the other charges and thus should be severed. On appeal, Gallegos contends that the Stabbing Charges should have been severed from the Police Station Charges. Because the argument before the trial court was substantially different from what is argued on appeal, and because trial counsel argued only why he thought a motion to sever would fail, we conclude that the issue is unpreserved. *See 438 Main St.*

(continued…)

ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (cleaned up).

¶20    Third, Gallegos contends that "the police lacked reasonable suspicion to stop [Gallegos] because he did not match the description of the alleged suspect." This presents a mixed question of law and fact.

> We review a trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact. While the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case. Accordingly, we review as a matter of law whether a specific set of facts gives rise to reasonable suspicion.

*State v. Sanchez-Granado*, 2017 UT App 98, ¶ 2, 400 P.3d 1110 (per curiam) (cleaned up).

## ANALYSIS

### I. Rule 23B Motion

¶21    Gallegos has filed a motion for remand under rule 23B of the Utah Rules of Appellate Procedure, seeking remand for five

---

(…continued)
*v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 ("In order to preserve an issue for appeal, the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." (cleaned up)).

issues: (1) failure to call an eyewitness expert who had been retained and who had submitted a report; (2) failure to call a forensics expert; (3) failure to move to sever the Stabbing Charges from the Police Station Charges; (4) failure to move to "sever" evidence of gang association; and (5) an opportunity to "explore" a variety of other complaints contained in an affidavit of Gallegos (including claims of excessive force, lost blood evidence, failure to provide unspecified documents, improper closing arguments by the prosecutor, and arguing that the prosecutor "visibly, but not audibly" coached witnesses).[5]

¶22   We have reviewed Gallegos's motion, the associated affidavits, and the State's response. We deny the motion. We address Gallegos's issue regarding severance because the relevant facts are already in the record. The other assertions fail because Gallegos has not explained how the evidence would have likely changed the result of the trial. Specifically, Gallegos does not squarely confront the majority of the evidence supporting the verdict.[6]

¶23   To be successful, a rule 23B motion (1) must be supported by an affidavit alleging facts outside the existing record, (2) those facts must be non-speculative, and (3) the alleged facts must, if true, support a determination that counsel's ineffectiveness

---

5. In his rule 23B motion, Gallegos asserts that the root of his counsel's ineffectiveness was in failing to meet with Gallegos often enough to "gather evidence in support of [Gallegos's] claims."

6. The dissenting opinion agrees that the rule 23B motion should be denied except as it pertains to trial counsel's (1) failure to meet with Gallegos for more than a few minutes until three weeks before trial and (2) decision not to call an expert on eyewitness identification who had been retained by predecessor counsel. *See infra* ¶ 60.

prejudiced the result. *State v. Tirado*, 2017 UT App 31, ¶ 14, 392 P.3d 926. Specifically, a defendant must present the "court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v. Christensen*, 2013 UT App 163, ¶ 4, 305 P.3d 222 (per curiam) (cleaned up); *see Strickland v. Washington*, 466 U.S. 668, 687–88 (1984) (articulating the prongs of the ineffective assistance of counsel test as (1) showing counsel's performance fell below an "objective standard of reasonableness" and (2) that the "deficient performance prejudiced the defense")

¶24   When analyzing evidence under the *Strickland* standard,

> [a] court must consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. Thus, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Ultimately, a reasonable probability is a probability sufficient to undermine confidence in the outcome.

*State v. Garcia*, 2017 UT 53, ¶ 42, 424 P.3d 171 (cleaned up). The United States Supreme Court has held that "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). And our supreme court has observed, "*Strickland's* requirement of a reasonable probability of a different outcome is a relatively high hurdle to overcome." *Garcia*, 2017 UT 53, ¶ 44 (cleaned up).

¶25   Gallegos's rule 23B motion fails to meet the *Strickland* standard. Gallegos does not acknowledge in his motion that

Victim's blood was found on his knife, shirt, pants, and ear.[7] He does not acknowledge that Witness gave a detailed description of Gallegos, whom Witness saw from ten feet away, which description enabled officers to locate Gallegos quickly. Gallegos does concede that he and trial counsel discussed the potential testimony of the retained eyewitness expert, and that trial counsel determined that the expert would not be helpful—a fact that undercuts his ineffective assistance claim. *See State v. Alzaga*, 2015 UT App 133, ¶ 86, 352 P.3d 107 ("Counsel's decision to call or not to call an expert witness is a matter of trial strategy, which will not be questioned and viewed as ineffectiveness unless there is no reasonable basis for that decision." (cleaned up)). The motion acknowledges that Gallegos does not actually know what the "forensic" expert would have testified. And the hodgepodge of other complaints made by Gallegos in his rule 23B affidavit is exactly the unsubstantiated fishing expedition that precedent has previously indicated will not sustain a rule 23B motion. *See State v. Griffin*, 2015 UT 18, ¶ 19 ("The mere hope that an individual may be able to provide information if subpoenaed to testify is not sufficient. An affiant must submit

---

7. The dissenting opinion characterizes "the eyewitness accounts of both Victim and Witness" as "some of the most powerful evidence at the State's disposal." *Infra* ¶ 62. While compelling, the eyewitness accounts are not the most powerful evidence in this case. The most powerful evidence is that Gallegos possessed a knife with Victim's blood on it and was otherwise covered with Victim's blood when arrested—facts that remain unchallenged in Gallegos's rule 23B motion and arguments on appeal. This blood evidence is especially compelling where both Victim and Witness testified that there was only one attacker who was in close proximity to Victim. The other attackers were described as "st[anding] back." Thus, the unrefuted evidence of Victim's blood in several locations on Gallegos's person becomes even more compelling—and untainted by any issues of false identification.

specific facts and details that relate to specific relevant occurrences."). Upon review, Gallegos's motion fails to establish facts that, if true, would have likely changed the result here. Given the fact that forensic evidence overwhelmingly tied Gallegos to the crime, that Victim identified Gallegos as the assailant, and that Gallegos's trial counsel determined that calling an eyewitness expert would not be helpful, any testimony offered by the eyewitness expert would not have likely changed the result.

¶26 We further comment on Gallegos's inability to carry his burden in demonstrating that his counsel was deficient for not calling an eyewitness expert. Trial counsel is not required to call an eyewitness expert to testify. *See State v. King*, 2017 UT App 43, ¶ 23 n.3, 392 P.3d 997 ("[R]ule 702 of the Utah Rules of Evidence governs only the admissibility of expert testimony, and [Utah precedent does] not transform admissible expert testimony into required expert testimony."). "To demonstrate that his counsel was ineffective in retaining and presenting expert witnesses, a defendant must rebut the strong presumption that under the circumstances, counsel's action might be considered sound trial strategy."[8] *Alzaga*, 2015 UT App 133, ¶ 86 (cleaned up). In other

---

8. The dissenting opinion resists this *strong* presumption, remarking that an affidavit from another attorney asserts that trial counsel's contract to provide indigent defense services had been terminated for failure to complete work assigned to him on an unrelated case. *See infra* ¶ 61 n.14. Our task, however, is not to allow trial counsel's reputation to color our conclusions, but to determine only whether counsel performed deficiently in this instance. *See Anderson v. Collins*, 18 F.3d 1208, 1215 (5th Cir. 1994) ("Both prongs of the *Strickland* test . . . require examination of the specific conduct and decisions made by counsel in the particular case; [the defendant] cannot establish that the representation he received was constitutionally inadequate merely from evidence about [trial counsel's] reputation or conduct in other cases.").

(continued…)

(…continued)

Evidence of substandard performance by Gallegos's counsel in another case does not inform us of any specific conduct or decision in the matter at hand. We do not downplay this affidavit as the dissent suggests. *See infra* ¶ 61 n.14. Instead, we view the affidavit under the established standard applicable to a rule 23B motion, a standard that the dissent overlooks: Is there evidence that, if presented after it is established on remand, would support *both* prongs of the *Strickland* test—deficient performance and prejudice? *See State v. Griffin*, 2015 UT 18, ¶ 17. The burden on the movant to make this showing has been described by our supreme court as a "high bar." *Id*. The dissent essentially says, "Well, let's see what the defendant comes up with on remand." The dissent thereby relieves Gallegos of his high-bar-burden and, if established as precedent, such an approach would so dilute the burden as to render a rule 23B remand nearly automatic when any attorney does not meet with his client. Instead, because Gallegos fails to explain—in fact, he makes literally no attempt to explain—how the failure of his attorney to meet with him had *any* impact on the trial in this case, the motion for remand on this basis must be denied.

Specifically, Gallegos points to *no* evidence on the issue of trial counsel's failure to meet with him that he anticipates eliciting on remand, but he is required to do so: "[T]he defendant must provide allegations of fact that are not speculative." *Id.* ¶ 19. Speculative facts are those which are the fruit of mere guesswork or conjecture. *Id*. This is all Gallegos offers as it pertains to trial counsel not meeting with him until weeks before trial. Gallegos does not claim, for example, that the failure to meet with him resulted in available evidence not being investigated or offered, nor does he claim a witness existed who was not contacted, nor does he claim that an alternate defense theory was not somehow explored. Because Gallegos identifies no specific evidence and offers no explanation as to how the evidence would inform the issue of ineffective assistance, the

(continued…)

words, "[t]his presumption may be overcome only if there is a lack of any conceivable tactical basis for counsel's actions." *State v. King*, 2012 UT App 203, ¶ 14, 283 P.3d 980 (cleaned up).[9] And

---

(…continued)

only purpose of remand on this issue would be to establish that his attorney had not met with him—a fact that the dissent ably points out is already in the record, *see infra* ¶ 61, and therefore is not a proper basis for remand, *see Griffin*, 2015 UT 18, ¶ 18. While we in no way endorse or fail to appreciate the substandard nature of trial counsel's repeated failure to meet with his client, the dissent's approach fails to require the correct showing, as established by our rules and precedent.

9. The dissenting opinion takes exception to our analysis of whether defense counsel was deficient, stating that "the majority speculates about some of the reasons why counsel might have reached this conclusion but, at least at this point, I find those potential reasons unconvincing. We simply do not know, on this record, why trial counsel elected not to call the expert." *Infra* ¶ 68. However, the long-established standard—whether there was "any *conceivable* tactical basis for counsel's actions"—invites, if not requires, an appellate court to speculate and does not require that defense counsel's actual reason for not calling an expert be articulated. *State v. King*, 2012 UT App 203, ¶ 14, 283 P.3d 980 (emphasis added) (cleaned up). And while the dissenting opinion does not find convincing the reasons we conceive for counsel's decision not to call the retained expert witness, our supreme court has expressly acknowledged such realities. *State v. Clopten*, 2009 UT 84, ¶ 20, 223 P.3d 1103 ("[W]here a witness sees the perpetrator under favorable conditions, expert testimony actually makes jurors more likely to convict."); *State v. Long*, 721 P.2d 483, 492 n.5 (Utah 1986) (noting that research indicates giving cautionary instruction in conjunction with strong eyewitness testimony serves to bolster the identification testimony).

(continued…)

given this "strong presumption of competence, we need not come to a conclusion that counsel, in fact, had a specific strategy in mind. Instead, we need only articulate some plausible strategic explanation for counsel's behavior. This calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Jackson v. State*, 2015 UT App 217, ¶ 15, 359 P.3d 659 (cleaned up).

¶27    Here, there was a conceivable basis for trial counsel's decision. Trial counsel could have reasonably calculated that putting this expert on the stand carried too significant a possibility that cross-examination by the State would serve only to solidify and repeatedly highlight the State's arguments concerning factors that made the eyewitness identification credible. Gallegos's rule 23B motion fails to address this or other

---

(…continued)

The "strong presumption" in favor of finding trial counsel's assistance adequate, coupled with an express burden on a defendant to persuade the appellate court that there is *no* conceivable tactical basis for a decision, can only be conscientiously administered post trial when an appellate court attempts to conceive of an appropriate strategy. *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (explaining that courts "will not question such decisions unless there is *no* reasonable basis supporting them" (emphasis added) (cleaned up)); *State v. Garcia*, 2017 UT App 200, ¶ 19, 407 P.3d 1061 (explaining that a defendant must "overcome the strong presumption that his trial counsel rendered adequate assistance by persuading the court that there was *no conceivable tactical basis* for counsel's actions" (cleaned up); *State v. Bryant*, 965 P.2d 539, 542–44 (Utah Ct. App. 1998) (accepting the State's suggested conceivable tactical bases and therefore concluding that the defendant had not overcome the strong presumption that counsel's performance was not deficient).

reasonable bases trial counsel may have considered in deciding not to call the eyewitness expert.

¶28 The rule 23B motion is denied.

## II. Ineffective Assistance for Not Moving to Sever

¶29 Gallegos argues that his trial counsel was ineffective for not moving to sever the Stabbing Charges from the Police Station Charges. Because the Stabbing Charges were neither connected in their commission nor part of a common scheme or plan with the Police Station Charges, we agree that a motion to sever would have likely been successful. We further agree that Gallegos's attorney performed below an objectively reasonable standard by not moving to sever. However, Gallegos was not prejudiced by his counsel's deficient performance.[10]

¶30 The Sixth Amendment guarantees defendants the right to effective assistance of counsel. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984). To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) "that counsel's performance was deficient," that is, falling below an "objective standard of reasonableness," and (2) "that the deficient performance prejudiced the defense." *Id.* at 687–88. We examine these requirements in turn.

---

10. Typically, where "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we will do so without analyzing whether counsel's performance was professionally unreasonable." *Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232; *see also State v. Hill*, 2018 UT App 140, ¶ 14. This would have been our course here because we anticipated the State would concede deficient performance on the severance issue. However, far from conceding the point, the State has vigorously opposed any claim of deficient performance. Therefore, we deem it advisable to address the issue fully.

A.      Deficient Performance

¶31    When challenging trial counsel's failure to make a motion, part of a defendant's burden under the deficient performance prong is to show that the motion would have been successful had it been made. *See State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104 (explaining that failure to raise a futile motion does not amount to ineffective assistance). Further, a defendant must otherwise establish "that the challenged actions cannot be considered sound strategy under the circumstances." *Menzies v. State*, 2014 UT 40, ¶ 76, 344 P.3d 581 (cleaned up).

1.      Successful Claim for Severance

¶32    We first examine whether Gallegos's motion to sever would have been successful, and we conclude that it likely would have.

¶33    Utah law allows the joinder of offenses in some circumstances. Specifically, "joinder of multiple offenses is appropriate if the requirements of Utah Code section 77-8a-1(1) are met and neither the defendant nor the prosecution is prejudiced as a result of the joinder." *State v. Balfour*, 2008 UT App 410, ¶ 18, 198 P.3d 471. Utah Code section 77-8a-1 states,

>    (1) Two or more felonies, misdemeanors, or both, may be charged in the same indictment or information if each offense is a separate count and if the offenses charged are:
>
>    (a) based on the same conduct or are otherwise connected together in their commission; or
>
>    (b) alleged to have been part of a common scheme or plan.
>
>    . . .

(4) (a) If the court finds a defendant or the prosecution is prejudiced by a joinder of offenses or defendants in an indictment or information or by a joinder for trial together, the court shall order an election of separate trials of separate counts, grant a severance of defendants, or provide other relief as justice requires.

Utah Code Ann. § 77-8a-1 (LexisNexis 2017).[11]

¶34 Pursuant to the joinder statute, to determine whether a motion to sever would be successful, we must decide whether the Stabbing Charges and the Police Station Charges were based on the same conduct or were otherwise connected in their commission. We then must decide whether the charges were part of a common scheme or plan.

a. The Offenses Were Not Connected in their Commission

¶35 The statute governing joinder requires only that the offenses be "connected together in their commission." *Id.* § 77-8a-1(a). We have held that crimes are connected in their commission where the later crime is "precipitated by an earlier one, such as where a later crime facilitates flight after the earlier one." *State v. Benson*, 2014 UT App 92, ¶ 13, 325 P.3d 855 (cleaned up). After examining other jurisdictions' application of the term "otherwise connected in their commission," we have concluded that "precipitation cases" from other jurisdictions "seem to share as a common element of their analysis the conclusion that most of the evidence admissible in proof of one offense is also

_____

11. Because the statutory provisions in effect in 2015—when Gallegos alleges his counsel failed to file a motion to sever the Stabbing Charges from the Police Station Charges—do not differ in any material way from those now in effect, we cite the current version of the Utah Code for convenience.

admissible in proof of the other." *State v. Smith*, 927 P.2d 649, 653 (Utah Ct. App. 1996) (cleaned up). Even where offenses "are not strictly precipitated by one another," we have held that sufficient connection exists where "the events are so related in time, location, and purpose that they are directly connected in a legally significant way." *State v. Burke*, 2011 UT App 168, ¶ 24, 256 P.3d 1102 (cleaned up). In *Burke*, this court reasoned that separate sexual offenses against multiple victims were sufficiently connected where "the offenses are closely related in time and place, occurring on the same night, within hours of each other, in the same house, and even in the same room on the same couch," and where the actions "illustrate a distinct behavioral arc of increasingly aggressive and opportunistic transgressions of sexual boundaries." *Id.* ¶¶ 22–23.

¶36 On the other hand, we have concluded that the commission of certain crimes was not sufficiently connected where "[o]ther than the fact that all of the conduct was committed by [a defendant], the charges were not directly related to one another." *State v. Hildreth*, 2010 UT App 209, ¶ 32, 238 P.3d 444. In *Hildreth*, a chiropractor was charged for sexually assaulting four women on separate occasions under the guise of providing chiropractic care. *Id.* ¶ 2. This court reasoned that the charges were neither "precipitated by the commission of the others, nor were any of the charges committed in an attempt to conceal the others," and thus concluded that "the charges were not connected in their commission as contemplated by section 77-8a-1(1)(a)." *Id.* ¶ 32.

¶37 The case before us is far more analogous to *Hildreth* than to the others. Gallegos stabbed Victim in a park and was later apprehended. Then, while at the police station, Gallegos acted violently, resulting in additional charges. Gallegos's violent behavior at the police station did not "facilitate[] flight" from the earlier attack, nor could the later crimes be characterized as "a single [violent] spree," as we would characterize a string of robberies, for example. *See Benson*, 2014 UT App 92, ¶¶ 13–14.

Neither do Gallegos's crimes demonstrate "a distinct behavioral arc of increasingly aggressive and opportunistic transgressions." *Burke*, 2011 UT App 168, ¶ 24. Instead, this case is more like *Hildreth*, where the defendant committed a sequence of offenses, but those offenses were not otherwise related to each other. *See* 2010 UT App 209, ¶ 32. Here, the stabbing at the park and the violent behavior at the police station are so independent that one does not provide any legally significant context to the other. *Burke*, 2011 UT App 168, ¶ 24. They therefore do not "share as a common element of their analysis the conclusion that most of the evidence admissible in proof of one offense is also admissible in proof of the other." *Smith*, 927 P.2d at 653 (cleaned up).

¶38   To be sure, this case is unlike *Hildreth* in that the charged acts here occurred on the same night, and there is an abstract connection between the charged offenses in that Gallegos was detained at the police station for his involvement in the stabbing. The State argues that the charges were connected due to the fact that Gallegos was tagging gang territory when he attacked Victim and "continued in this aggressive arc" after seeing pictures of gang members on the wall at the police station. But that abstract connection, in our view, is not the type of distinct connection described in our previous cases. *See Burke*, 2011 UT App 168, ¶ 24. Instead, the connection in this case is akin to that in *Hildreth*, where a chiropractor used his office and position to sexually assault multiple victims, but the separate incidents did not support joinder of the offenses at trial. 2010 UT App 209, ¶ 32. The fact that Gallegos committed the crimes on the same night and debatably in defense of his gang is not enough to demonstrate that "the events [were] so related in time, location, and purpose that they are directly connected in a legally significant way." *Burke*, 2011 UT App 168, ¶ 24. We therefore conclude that "the charges were not connected in their commission as contemplated by section 77-8a-1(1)(a)." *Hildreth*, 2010 UT App 209, ¶ 32.

b.      Common Scheme or Plan

¶39    We next examine the second prong of Utah code section 77-8a-1(1)—whether the charged conduct was part of a common plan or scheme. Utah Code Ann. § 77-8a-1 (LexisNexis 2017). "To be classified as a common plan or scheme it is not necessary for the crimes to have been perpetrated in an absolutely identical manner, so long as the court perceives a visual connection between the crimes." *State v. Hildreth*, 2010 UT App 209, ¶¶ 33, 238 P.3d 444 (cleaned up). This usually means that the charged crimes should share "striking similarities." *Id.* ¶¶ 33, 36. Additionally, we have held that the crimes sharing a common scheme or plan also have a similar proximity in time. *Id.* ¶ 34.

¶40    We conclude that the Stabbing Charges and the Police Station Charges do not share a common scheme or plan. The only similarity in the conduct is that Gallegos acted violently in both situations. But this is not strikingly similar conduct, such as where a person carries out multiple crimes similar in minute detail. *See State v. Lee*, 831 P.2d 114, 118 (Utah Ct. App. 1992) (concluding that joinder was appropriate under common scheme where the defendant's conduct included targeting gay men at bars, playing pool with them, convincing them to leave the bar and ride on his motorcycle, driving each victim to a remote location in the same canyon, robbing his victims by holding a knife to their throats, ordering them to disrobe, and scattering their clothes before driving away, with all incidents occurring within five days of each other).

¶41    In the first instance, Gallegos stabbed a person for intruding on his efforts to spray paint a bathroom wall. In the second, Gallegos attacked and spit on a police officer and put a hole in a wall while confined at a police station. Other than a broad category of violence, there is no "visual connection between the crimes." *Hildreth*, 2010 UT App 209, ¶ 33 (cleaned up). The State again argues that the common plan or scheme between the crimes was Gallegos's desire to defend his gang's

territory and members. But this is a broad and abstract similarity, not one in which the commission was strikingly similar. Thus, the charged conduct was not part of a common scheme or plan.

¶42   Having determined that the Stabbing Charges and the Police Station Charges were unconnected in their commission and not part of a common scheme or plan, we conclude that a motion to sever would have succeeded at trial. *See id.* ¶ 37 (concluding that a trial court "exceeded its permissible range of discretion in denying [a] motion for severance" where the charges were not connected in their commission nor part of a common scheme or plan).

2.    Sound Trial Strategy

¶43   Next, to determine if Gallegos's counsel performed deficiently, we analyze whether failing to file a motion to sever could conceivably advance a sound trial strategy. We see no legitimate strategy under the circumstances, and neither party asserts that Gallegos's trial counsel refrained from objecting to advance a particular strategy. And, as discussed above, a motion to sever would have succeeded had counsel made the motion. Counsel's performance was therefore deficient. *See State v. Hallett*, 796 P.2d 701, 706 (Utah Ct. App. 1990) (concluding that "a motion to sever . . . would likely have been granted had the motion been made" and, therefore, "counsel's performance was deficient since he did not make such a motion").

B.    Probability of a Different Result

¶44   Having determined that trial counsel's performance was deficient, we turn to the second *Strickland* requirement, which obligates a defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "A reasonable probability is

a probability sufficient to undermine confidence in the outcome." *Id.*

¶45    Under this standard, we conclude that Gallegos was not prejudiced by his counsel's deficient performance. Because there is strong evidence against the charged conduct, our confidence in the outcome of the trial is not undermined.

¶46    First, the evidence against Gallegos in relation to the Stabbing Charges was overwhelming. On the night of the stabbing, Gallegos was arrested with Victim's blood on his clothes and behind his ear. An officer found a knife covered in Victim's blood in Gallegos's pocket. Victim identified Gallegos as the person who stabbed him based on a photo lineup. We admit that evidence of Gallegos spitting at an officer, kicking an officer, and putting a hole in a wall at the police station would certainly not endear Gallegos to a jury. But evidence of Gallegos's violent behavior at the police station could not reasonably have impacted Gallegos's conviction on the Stabbing Charges in the sense that it made the difference in the jury's decision to convict; the evidence against him was simply too great. And Gallegos offers no persuasive explanation of how severing his charges would have produced a different outcome at trial, further supporting our conclusion that severing the charges would not have made a difference.[12] *See Hallett*, 796 P.2d at 707.

---

12. The dissent is "not necessarily persuaded that the prejudicial effect of the failure to sever, standing alone, would have raised a 'significant possibility' of a different outcome, given the relative strength of the State's evidence." *Infra* ¶ 70. Rather, the dissent would prefer to wait and see whether Gallegos is able to demonstrate his attorney's lack of preparation and ineffective assistance in calling an eyewitness expert before making a prejudice determination on severance. This approach, however,

(continued…)

¶47     Second, we similarly conclude that evidence of the Stabbing Charges did not prejudice Gallegos in his convictions stemming from the Police Station Charges. Even though the Stabbing Charges are more gruesome and serious, the evidence supporting convictions for the Police Station Charges was overwhelming. Multiple officers witnessed Gallegos's violent behavior at the police station, and Gallegos points to no meaningful dispute of that evidence. Thus, even though those charges were tried in conjunction with another potentially inflammatory set of charges, the amount of evidence against him, coupled with the apparent lack of any meaningful disagreement concerning that evidence, sustains our confidence in the ultimate outcome.

¶48     Because Gallegos has not shown that a more favorable outcome at trial was likely had the charges been severed, we reject his ineffective assistance of counsel argument.

## III. Reasonable Suspicion

¶49     Gallegos argues that the trial court erred in denying his motion to suppress because it "base[d] its finding on whether [Gallegos] was arrested, where the critical inquiry was whether the officer had reasonable suspicion to make the stop." We disagree. Even assuming the encounter was a level two stop, as

---

(…continued)
is little more than a fishing license for Gallegos. *See supra* Part I. To repeat, on a rule 23B motion, it is a defendant's burden to show that non-speculative facts would support a determination that counsel's ineffectiveness prejudiced the result. *State v. Tirado*, 2017 UT App 31, ¶ 14, 392 P.3d 926. A defendant must present the "court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v. Christensen*, 2013 UT App 163, ¶ 4, 305 P.3d 222 (per curiam) (cleaned up).

Gallegos argues, the officer had reasonable, articulable suspicion to temporarily seize Gallegos.

¶50    The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In determining whether a seizure is reasonable under the Fourth Amendment, courts analyze the three constitutionally permissible levels of police stops. *See State v. Johnson*, 805 P.2d 761, 763 (Utah 1991). "A level one encounter occurs when a police officer approaches a citizen and asks questions, but the person is not detained against his will and remains free to leave." *State v. Biggs*, 2007 UT App 261, ¶ 10, 167 P.3d 544 (cleaned up). "A level two encounter occurs when a police officer temporarily seizes an individual because the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime." *Id.* (cleaned up). "Finally, a level three stop occurs when a police officer has probable cause to believe that a crime has been committed and effects an arrest of the suspect." *Id.*

¶51    Our supreme court has stated,

> It is settled law that a police officer may detain and question an individual when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity. To detain an individual under such circumstances, the officer's suspicion must be supported by specific and articulable facts and rational inferences, and cannot be merely an inchoate and unparticularized suspicion or hunch.

*State v. Simons*, 2013 UT 3, ¶ 21, 296 P.3d 721 (cleaned up). "The standard for reasonable suspicion is relatively low. Indeed, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a

preponderance of the evidence standard." *State v. Morris*, 2011 UT 40, ¶ 29, 259 P.3d 116 (cleaned up).

¶52    Here, the officer was instructed, based on eyewitness accounts, to look for Hispanic males wearing white clothes in a Toyota Camry on a specific dead-end street. The officer arrived at the dead-end street within a minute or two of receiving the description. Gallegos was wearing dark clothes instead of white and was standing with two women instead of other men. Nevertheless, he was (1) standing next to a Toyota Camry, (2) on the dead-end street where the attackers had fled and where the Camry returned, and (3) engaged with the officer within minutes of the officer receiving an instruction from dispatch to investigate the area. A reasonable officer, seeing the parked Camry, could conclude that Gallegos had been in the vehicle, or at least knew its occupants, because he stood next to it.

¶53    The case law Gallegos relies on to support his argument is inapposite. In *State v. Swanigan*, 699 P.2d 718 (Utah 1985), the primary case on which Gallegos bases his argument, our supreme court explained that a stop "based solely on a description by a fellow officer who had observed [two men] walking along the street at a late hour in an area where recent burglaries had been reported" could not form the basis of reasonable suspicion. *Id.* at 719. Similarly, in *State v. Steward*, 806 P.2d 213 (Utah Ct. App. 1991), this court held that officers had no reasonable basis to stop a person's truck as he entered a cul-de-sac where they had recently executed warrants on meth houses. *Id.* at 216.

¶54    But Gallegos was not merely in a neighborhood where crimes had been reported. He was, only minutes after the crime was reported, standing next to the suspect vehicle on the very street to which witnesses reported seeing the attackers and their vehicle flee. Furthermore, neither of the cases Gallegos cites relied on eyewitness accounts. Here, the officer knew, based on eyewitness reports, that (1) he was looking for Hispanic males

who had recently fled down the dead-end street, (2) a Camry had picked up the suspects, and (3) the Camry had just returned to the dead-end street. These are articulable facts giving rise to reasonable suspicion that Gallegos—who is Hispanic and was right next to the Camry, on the dead-end street, minutes after the officer had received the report—was involved with the fleeing suspects. *See State v. Markland*, 2005 UT 26, ¶¶ 20–21, 112 P.3d 507 (holding that a police officer's detention of a defendant "was justified at its inception by a reasonable suspicion that crime was afoot and that [the defendant] was connected to that crime" where the officer arrived at an apartment complex in the early morning hours—just minutes after receiving a report of someone screaming—and defendant was the only person on the dead-end street); *see also Sanchez v. Florida*, 199 So. 3d 472, 475 (Fla. Dist. Ct. App. 2016) (analyzing whether an officer had reasonable suspicion based on a report from dispatch by considering "the length of time and distance from the offense, route of flight, specificity of the description of the vehicle and its occupants, and the source of the . . . information" (cleaned up)).

¶55　We conclude that even if the officer's encounter with Gallegos was a level two stop, the officer had reasonable, articulable suspicion that supported briefly detaining Gallegos. Thus, the trial court did not err in denying the motion to suppress.

CONCLUSION

¶56　We deny Gallegos's rule 23B motion with respect to the failure to call an eyewitness expert and issues related to evidence because there was a conceivable basis for his trial counsel's strategy and because Gallegos was not prejudiced by these alleged deficiencies. We also conclude that, even though Gallegos's counsel performed deficiently by failing to make a motion to sever the Stabbing Charges from the Police Station Charges, counsel's failure does not undermine our confidence in the result at trial. We further conclude that the trial court

properly denied Gallegos's motion to suppress because the officer had reasonable, articulable suspicion to temporarily seize Gallegos. We therefore affirm Gallegos's convictions.

———————

HARRIS, Judge (concurring in part and dissenting in part):

¶57    I concur with the majority's analysis in Section III in its entirety. I also concur with the majority's analysis in Section II.A. I disagree, however, with the conclusions the majority reaches in much of Section I and most of Section II.B, and due to this disagreement I cannot join in the majority's resolution of this appeal, at least not at this stage of the proceedings.

¶58    The majority persuasively explains that Gallegos's trial counsel performed deficiently by failing to seek a separate trial for the Police Station Charges. The majority concludes, however, that his attorney's deficient performance did not prejudice Gallegos, because "the evidence against him [on the Stabbing Charges] was simply too great." *See supra* ¶ 46. While I certainly acknowledge that the State introduced several pieces of powerful evidence at trial that indicated Gallegos's guilt, at this point I cannot agree—at least not where Gallegos has raised other questions about the effectiveness of his attorney in a rule 23B motion that, in my view, must first be resolved—that there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

¶59    As an initial matter, I note that *Strickland*'s "reasonable probability" standard is not the same as the "more likely than not" standard applied in civil cases. Our supreme court has stated that the "more likely than not" standard is "more demanding" than the "reasonable probability" standard. *See Tillman v. State*, 2005 UT 56, ¶ 29 n.7, 128 P.3d 1123 (quoting *Strickler v. Greene*, 527 U.S. 263, 297–300 (1999) (Souter, J., concurring and dissenting)), *superseded in part by statute on other grounds as stated in Gordon v. State*, 2016 UT App 190, ¶ 32 n.8,

382 P.3d 1063. The reasonable probability standard is "more akin to a 'significant possibility' of a different result." *Id.* (citation omitted). A "reasonable probability of a different result occurs" when a court's "confidence in the outcome of the trial" is undermined. *Id.* ¶ 29 (cleaned up). In other words, in order to win reversal, Gallegos does not have to convince us that there is a greater than 50% chance that the outcome of his trial would have been different. Instead, he must simply raise issues that undermine our confidence in the outcome of Gallegos's trial, and persuade us that there is a "significant possibility" of a different result. At this point in the proceedings, before a court adjudicates the issues Gallegos has raised in his rule 23B motion, my confidence in the outcome of Gallegos's trial is not solid enough to warrant affirmance under this standard.

¶60 Aside from the one irregularity that the majority and I agree upon—counsel's failure to seek severance—I am also concerned with two of the issues[13] Gallegos raises in his rule 23B motion, and I would accordingly grant that motion and remand for resolution of those two issues. First, I am concerned that counsel did not pay enough attention to this case. Second, I am concerned with counsel's failure to introduce expert testimony regarding the infirmities inherent in eyewitness identification testimony.

¶61 With regard to the first issue, Gallegos avers in his rule 23B affidavit that his trial counsel was appointed to represent him in August 2014, but that counsel did not meet with him (outside of a handful of brief discussions in the courthouse holding cell) until May 18, 2015, less than three weeks before trial. In this case, it is impossible to dismiss these averments as the self-serving statements of an imprisoned defendant, because trial counsel himself admitted to these facts on the record at a

---

13. I agree with the majority's analysis with regard to the other three issues raised in the rule 23B motion.

pretrial hearing just a few weeks prior to trial. After Gallegos complained to the court that he had only spent a grand total of "five[] [or] six minutes in ten months" with his counsel, despite having "tried sending him letters" and "calling him," trial counsel did not dispute Gallegos's account, stating on the record that he had been busy with a capital murder case and that "[j]ust because I haven't met with him doesn't mean I'm not prepared for trial."[14] The trial court then ordered counsel to meet with Gallegos, astutely noting that "sometimes defendants have a keener apprehension of the facts than anyone else because they were present or at least allegedly present when the matter occurred," and that failing to give the defendant the opportunity to "go over all the discovery" and otherwise participate in the preparation of the case "can disable the defense." On May 18, 2015, a few days after the court ordered him to meet with his client, trial counsel held his first substantive meeting with Gallegos. This was less than three weeks prior to trial. It should go without saying that failure to hold even one substantive

---

14. Gallegos has also produced an affidavit from another attorney who worked with trial counsel on the same capital murder case by which counsel was supposedly distracted, and this other attorney avers that trial counsel failed to do the work assigned to him on that capital murder case and that as a result "his contract . . . to provide indigent defense services has been terminated." The majority downplays this affidavit, on the ground that "[e]vidence of substandard performance by Gallegos's counsel in another case" sheds no light on his performance in this case, and because ineffective assistance of counsel cannot be established by evidence of an attorney's poor general reputation. *See supra* ¶ 26 n.8. But this was not merely a reputational issue; indeed, according to trial counsel's own statement to the court, counsel's performance in the two cases are directly connected, because counsel's explanation for not meeting with Gallegos in this case was that he was ostensibly too busy with the other one.

meeting with one's client for nine months following retention, and postponing any such meeting until less than three weeks prior to trial—and only after it was ordered by the court— is substandard attorney conduct in a case as serious as this one.

¶62   With regard to the second issue, some of the most powerful evidence at the State's disposal was the eyewitness accounts of both Victim and Witness, who both (in varying ways) identified Gallegos as the stabber. Witness did so at a police "showup" that took place on the night in question, in which Gallegos was the only potential suspect for Witness to choose from. Victim did so the next day, by way of a photo lineup.

¶63   Our supreme court has acknowledged that eyewitness identification evidence can be problematic, because jurors tend to overvalue it while overlooking its inherent flaws. *See State v. Clopten*, 2009 UT 84, ¶¶ 15–29, 223 P.3d 1103. "Decades of study . . . have established that eyewitnesses are prone to identifying the wrong person as the perpetrator of a crime, particularly when certain factors are present." *Id.* ¶ 15. For instance, and among other factors, people tend to "identify members of their own race with greater accuracy than they do members of a different race." *Id.* "[T]here is little doubt that juries are generally unaware of these deficiencies in human perception and memory and thus give great weight to eyewitness identifications." *Id.* To overcome these "inherent deficiencies" in eyewitness identification testimony, "expert testimony is generally necessary to adequately educate a jury" about the subject. *Id.* ¶ 16.

¶64   It does not follow from *Clopten*, however, that counsel's failure to call an eyewitness identification expert "presumptively renders counsel ineffective without regard for the circumstances of a particular case." *See State v. Willey*, 2011 UT App 23, ¶ 19, 248 P.3d 1014. If a particular case is "among those cases 'in which a witness viewed the perpetrator under such ideal

conditions that an expert would not be able to identify factors that could have contributed to a misidentification,'" counsel cannot be said to act ineffectively by declining to call an eyewitness identification expert. *See State v. Heywood*, 2015 UT App 191, ¶ 28, 357 P.3d 565 (quoting *Clopten*, 2009 UT 84, ¶ 33). Moreover, "such expert testimony does not always benefit the defendant," and "when an eyewitness-identification expert's testimony is likely to reinforce the credibility of identifications made by eyewitnesses, declining to bring the expert to the witness stand may be sound trial strategy." *See State v. King*, 2017 UT App 43, ¶ 19, 392 P.3d 997.

¶65    In this case, conditions were certainly not entirely ideal, and various factors militate in both directions. Indeed, trial counsel was actually in possession of a draft report from a potential expert witness who identified several factors that might militate in Gallegos's favor and undermine Witness's eyewitness identification. *Clopten*'s first category of factors "pertains to the observer" and his ability to perceive the events in question. *See Heywood*, 2015 UT App 191, ¶ 19 (quoting *Clopten*, 2009 UT 84, ¶ 32 n.22). Where the witness has vision issues, or is tired, injured, or intoxicated, the witness's perceptive abilities may be impaired. *Id.* Also, where the witness is a different race than the suspect, the witness's ability to accurately identify the suspect may be impaired. *Id.* Some of these factors are (or may be) helpful to the defense, including the cross-racial identification factor.

¶66    The second category of factors pertains to the "event witnessed" and the "circumstances of the observation," including such things as whether the event is high-stress, lighting and visibility issues, distance, distractions, and whether a weapon was present. *Id.* ¶ 20 (cleaned up). The presence of any of these factors would tend to undermine the credibility of an eyewitness's identification. Many of these factors are present here—the event was high-stress; it was dark, and the scene was variably lit; and a weapon was present.

¶67    The third category of factors "pertains to the eyewitness's later identification of the suspect," including the length of time between observation and identification, and whether the identification occurred at an in-person lineup, photo lineup, or showup, and what procedures the officers used in staging the lineup or showup. *Id.* ¶ 23. Some of these factors are present here, at least with regard to one of the eyewitnesses—Witness's identification occurred after a one-man showup similar to the one effectuated in *State v. Ramirez*, 817 P.2d 774, 784 (Utah 1991).

¶68    One of Gallegos's previous attorneys had identified and retained an expert who could testify at trial and explain to the jury the limitations of eyewitness identification testimony. Trial counsel, however, elected not to call that (or any other) expert regarding eyewitness identification testimony, apparently because trial counsel determined that the expert would not be helpful. In its opinion, the majority speculates about some of the reasons why counsel might have reached this conclusion but, at least at this point, I find those potential reasons unconvincing. We simply do not know, on this record, why trial counsel elected not to call the expert, and in a case like this one where both (a) eyewitness identification testimony was so important and (b) there are legitimate questions about trial counsel's level of preparedness, I would grant the rule 23B motion so that more information can be gained about trial counsel's reason for making what might seem to be a questionable decision. *See King*, 2017 UT App 43, ¶¶ 16–24 (granting a rule 23B motion, but eventually determining—after a remand in which the trial court had made a factual finding that counsel had "made an informed, reasonable strategic decision" based on many factors "that an eyewitness identification expert would not be helpful to the defense but would instead likely end up hurting it"—that counsel had not acted ineffectively (cleaned up)).

¶69    Finally, I am persuaded that the jury, in determining Gallegos's guilt on the Stabbing Charges, was—at least to some degree—affected by hearing the evidence of the Police Station

Charges.[15] Gallegos's primary defense to the Stabbing Charges was that he was present at the scene of the stabbing, but that he was not the stabber. The jury heard testimony from several police officers that, after he was apprehended, he kicked a police officer, tried to run away from a police officer, yelled and screamed at police officers, spit on police officers, and gouged a large hole in the wall of one of the rooms at the police station by throwing or kicking a chair into the wall. This evidence—which the trial court should have severed and kept from the jury deciding Gallegos's guilt on the Stabbing Charges—no doubt made it easier for the jury to believe that Gallegos was a person inclined to violence, and no doubt had some effect on the jury's decision to convict Gallegos on the Stabbing Charges.

¶70 I am not necessarily persuaded that the prejudicial effect of the failure to sever, standing alone, would have raised a "significant possibility" of a different outcome, given the relative strength of the State's evidence. But I am not comfortable definitively answering the "prejudice" question in this case until after the rule 23B motion is resolved. Even the majority acknowledges that Witness's identification of Gallegos at the police showup "is problematic." *See supra* ¶ 10 n.3. It is possible that Gallegos might be able to demonstrate a "significant possibility" of a different result, depending upon the outcome of his rule 23B motion. If Gallegos is eventually able to demonstrate that his attorney was unprepared, or that his attorney acted ineffectively by failing to call an eyewitness identification expert, the contours of the "prejudice" inquiry may look a lot different.

---

15. I agree with the majority's analysis, *supra* ¶ 47, that there is not a reasonable probability that the outcome of a severed trial on the Police Station Charges would have been different, because the evidence of Gallegos's guilt on the Police Station Charges was overwhelming.

¶71    Accordingly, I cannot join in the result that the majority reaches here. I would grant the rule 23B motion and, after reviewing the outcome of the proceedings on remand, at that point revisit the question of prejudice—that is, whether there is a "significant possibility" of a different outcome, and whether my confidence in the outcome of the trial is undermined.

———————